**Rubie ROGERS, et al.,**
**Plaintiffs, Appellees,**

v.

**Robert OKIN, et al.,**
**Defendants, Appellants.**

**No. 86–1777.**

United States Court of Appeals,
First Circuit.

Argued April 7, 1987.
Decided June 12, 1987.

Suzanne E. Durrell, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief for defendants, appellants.

Marshall Simonds and Richard W. Cole with whom Stahlin and Bergstresser, Inc., Boston, Mass., was on brief for plaintiffs, appellees.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

COFFIN, Circuit Judge.

This is the fee tail of a very long dachshund of civil rights litigation involving mental patients at a state hospital, which began in 1975 and in due course involved all three levels of federal courts as well as the Supreme Judicial Court of Massachusetts.[1] The merits having at last been re-

---

1. *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982); *Mills v. Rogers,* 454 U.S. 1136, 102 S.Ct. 990, 71 L.Ed.2d 288 (1982); *Mills v. Rogers,* 454 U.S. 936, 102 S.Ct. 471, 70 L.Ed.2d 245 (1981); *Okin v. Rogers,* 451 U.S. 906, 101 S.Ct. 1972, 68 L.Ed.2d 943 (1981); *Rogers v.*

solved, the present issue is what fees and costs, if any at all, should be paid counsel for plaintiffs under the authority of 42 U.S.C. § 1988.

The underlying lawsuit was brought by seven patients against the Massachusetts Commissioner of Mental Health, directors of separate mental health units of Boston State Hospital, and various psychiatrists and psychologists, seeking declaratory and injunctive relief against the forcible administration of anti-psychotic drugs to and the involuntary seclusion of both voluntarily and involuntarily committed mental patients in non-emergencies. Compensatory and punitive damages were also sought. A class was certified—all patients who have been or will be secluded or medicated without their consent at the two units of the hospital.

The stages of the litigation began with a temporary restraining order preventing then existing non-emergency seclusion and medication practices. It continued with settlement efforts, summary judgment motions, an interlocutory appeal, and a 74–day trial followed by a district court decision granting injunctive relief but denying damage claims. An appeal only from relief as to medication led to an appellate decision affirming in most respects the district court's decision. There was then a grant of certiorari by the Supreme Court followed by a remand to us and our eventual certification of some nine questions to the Supreme Judicial Court of Massachusetts concerning the applicability of a recent decision involving the right of a non-institutionalized mental patient to refuse anti-psychotic drugs. Subsequently that court provided a set of rules governing the administering of anti-psychotic drugs, a decision which we recognized created federally protected liberty interests and also provided adequate state law process making unnecessary the continuation of a federal court injunction. The district court's order dissolving the injunction was entered in June, 1984, some nine years after the filing of the complaint.

The present proceedings, relating to plaintiffs' request for attorney's fees and costs, have encompassed multiple depositions, interrogatories, one non-evidentiary hearing, a three-day trial, dozens of exhibits, and some 260 pages of proposed findings of fact. The district court made the following six findings: (1) plaintiffs were the "prevailing party" within the meaning of 42 U.S.C. § 1988, their claims concerning forced medication and seclusion being "essentially vindicated" and the rejected damages claims sharing a common core of facts and related legal theories with the claims for injunctive relief; (2) the time spent by plaintiffs' attorneys in the trial, appellate, and fee phases was reasonable and involved no unnecessary duplication; (3) time records since mid–1977 were detailed and contemporaneous and, prior to this time, the reconstructed estimates of undocumented time were sufficiently reliable; (4) in the case of one of plaintiffs' attorneys, preclusion from other employment is a relevant factor; (5) the customary community hourly rate testimony of plaintiffs' expert, Barshak, was adopted and that of defendants' expert rejected, the court further accepting present legal rates as an "appropriate means to compensate counsel for the delay in fee payment"; and (6) other factors—the results obtained, skill of counsel, unattractiveness and contingent nature of the litigation—do not require an upward adjustment in the lodestar. The court accordingly made a total award of fees and costs in the amount of $1,467,242.43. 638 F.Supp. 934 (D.Mass.1986).

There are three issues that merit discussion: (I) whether the district court's finding that plaintiffs were "prevailing parties" is supportable under the teaching of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); (II) whether the Commonwealth enjoys an Eleventh Amendment sovereign immunity precluding adoption of current legal hourly rates to compensate for delay in payment of the fee award under the teaching of *Library of Congress*

*Okin,* 738 F.2d 1 (1st Cir.1984); *Rogers v. Okin,* 634 F.2d 650 (1st Cir.1980); *Rogers v. Okin,* 478 F.Supp. 1342 (D.Mass.1979); *Rogers v. Commis-* *sioner, Department of Mental Health,* 390 Mass. 489, 458 N.E.2d 308 (1983); *In re Guardianship of Roe, III,* 383 Mass. 415, 421 N.E.2d 40 (1981).

*v. Shaw,* —— U.S. ——, 106 S.Ct. 2957, 92 L.Ed.2d 950 (1986); (III) whether the district court's lodestar findings as to time spent and hourly rates are supportable.

## I. Prevailing Parties

In assessing whether the district court exercised its discretion appropriately, we look first to *Hensley v. Eckerhart,* 461 U.S. 424, 434–435, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983):

> Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

Particularly pertinent to this case are the following comments by the Court:

> We agree with the District Court's rejection of "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon." Such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors. Nor is it necessarily significant that a prevailing plaintiff did not receive all the relief requested. For example, a plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time.

461 U.S. at 435–36 n. 11, 103 S.Ct. at 1940–41 n. 11 (citation omitted).

■ In this case plaintiffs' counsel coded all their time and deleted some 363 hours spent on damage issues wholly unrelated to claims for injunctive relief. Research of the law dealing with the good faith immunity defense to the federal damage claims was an example. Although defendants express amazement that out of more than 10,000 hours, so little a portion could so be spent, we have no basis for faulting the district court's finding in effect that most of the evidence relevant to damage claims was also necessary to justify injunctive relief. The district court's conclusion remarkably paralleled those of the district court that were upheld in *Riverside v. Rivera,* —— U.S. ——, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986).[2]

■ That plaintiffs achieved success on the significant injunctive issues, medication and seclusion, "which achieve[d] some of the benefit the parties sought," *Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir.1978), seems clear to us. Defendants have adopted the kind of "mathematical approach" criticized in the above-quoted footnote from *Hensley* by including their own twelve-page accounting of the extent of plaintiffs' success on all of the discernible issues. Defendants, for example, claim victory on no fewer than 224 federal and state damage issues. Their attack is reminiscent of the unsuccessful effort in *Riverside v. Rivera,* 106 S.Ct. at 2686, to overturn the award of the district court. In that case, as now Chief Justice Rehnquist noted in dissent, out of 256 separate claims against 32 defendants, plaintiffs finally won modest damages against only six defendants, claims for injunctive and declaratory relief having been dropped. *Riverside,* 106 S.Ct. at 2702 (Rehnquist, J., dissenting).

The Commonwealth further depreciates the results achieved by claiming that any real relief must be attributed to the Supreme Judicial Court's decision based on state law and a pre-existing state statute merely interpreted by the district court.

**2.** All claims made by plaintiffs were based on a common core of facts. The claims on which plaintiffs did not prevail were closely related to the claims on which they did prevail. The time devoted to claims in which plaintiffs did not prevail cannot reasonably be separated from time devoted to claims on which plaintiffs did prevail.

*Riverside,* 106 S.Ct. at 2693 (citation omitted).

Yet it concedes, as it must, not only that partial relief was achieved as to both the medication and seclusion claims for injunctive relief (Appellants' Brief at 25–26) but that there has been "an impact in the real world in terms of policies and practices regarding forcible medication of involuntary patients in state care facilities." (*Id.* at 33.)

We are not strangers to this case. For the Commonwealth to argue that the results of plaintiffs' lawsuit—their success in both the district court and before us, the significant rulings of the Supreme Judicial Court (which we have recognized as describing a federally protectible liberty interest), and the policy statements issued by the Department of Mental Health, with their impact on mental health facilities and Family and Probate Court procedures now in place in Massachusetts—do not qualify them as very substantially "prevailing parties" seems to us more the result of long entrenched partisan advocacy than of dispassionate analysis. The district court's ruling was well within its discretion.

## II. Sovereign Immunity

■ The district court, very sensibly we think, adopted plaintiffs' expert's suggestion that in an attenuated case like this, where more than a decade of inflation has continually eroded the value of the dollar, current (1986) hourly rates should be awarded to compensate for the delay in payment of attorneys' fees.

Only a few days after the district court issued its fee award, however, the Supreme Court issued its opinion in *Library of Congress v. Shaw*, —— U.S. ——, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). In that case, the district court, in calculating an attorney's fee for a plaintiff who had prevailed in a lengthy litigation under Title VII of the Civil Rights Act of 1964 against the Library of Congress, increased the lodestar fee by 30 percent to compensate counsel for the delay. Justice Blackmun, writing for the Court, noted the history of the rule recognizing the immunity of the federal sovereign, absent its consent, from claims of interest. He then addressed the Title VII fee statute at issue, 42 U.S.C. § 2000e-5(k), which not only gave a prevailing party a "reasonable attorney's fee" as part of the costs, but also provided, "and the United States shall be liable for costs the same as a private person." The Court then held that none of the key phrases or words—"the same as a private person," "reasonable attorney's fee," or "costs"—constituted a waiver of sovereign immunity. Finally, the Court dealt with an alternative argument, that the no-interest rule did not prohibit the award of compensation for delay, saying:

> We are not persuaded. Interest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money. The no-interest rule has been applied to prevent parties from holding the United States liable on claims grounded on the belated receipt of funds even when characterized as compensation for delay.

106 S.Ct. at 2965.

Plaintiffs make three arguments against the applicability to this case of *Library of Congress*. The first is that defendants failed to raise the Eleventh Amendment issue in the district court, even by a motion for reconsideration. This, however, is a jurisdictional defense and may be raised at any time. *Edelman v. Jordan*, 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974).

A second argument is that the Commonwealth waived its immunity when, in a brief to the district court, it argued that if, as it had urged, historic hourly rates were applied, "an upward adjustment [of 8 percent] for delay in payment would be appropriate.... [b]ased on what other courts have done." [3] This undertaking was of course not expressly a willingness to accept current rates. Nor can its generalized acceptance, based on the then current practice of courts within the circuit, of award-

**3.** Defendants' proposed finding of fact No. 25 cited *Brown v. Gillette,* 536 F.Supp. 113 (D.Mass. 1982); *Gabriele v. Southworth,* 712 F.2d 1505 (1st Cir.1983); *Heritage Homes of Attleboro, Inc. v. Seekonk Water District,* 548 F.Supp. 167 (D.Mass.1982).

ing prejudgment interest against a state, fairly be said to be stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974). In short, if the Commonwealth reasonably concluded that there was nothing to waive, how can it be said *clearly* to have waived it?

■ On the merits, plaintiffs urge that 42 U.S.C. § 1988 was enacted pursuant to Congress's enforcement power under section 5 of the Fourteenth Amendment and that therefore the Eleventh Amendment immunity from prejudgment interest on fee awards has been abrogated. We recognize that Congress could achieve this result. As the Court made clear in *Hutto v. Finney,* 437 U.S. 678, 696, 98 S.Ct. 2565, 2576, 57 L.Ed.2d 522 (1973), "Congress [may] amend its definition of taxable costs and have the amended class of costs apply to the States ... without expressly stating that it intends to abrogate the States' Eleventh Amendment immunity." Our problem in the instant case is that Congress has not yet made any statement suggesting that a § 1988 attorney's fee award should include prejudgment interest. Indeed, as recently as 1986 the Court in *Library of Congress* reiterated that "Prejudgment interest ... is considered as damages, not a component of 'costs'.... A statute allowing costs, and within that category, attorney's fees, does not provide the clear affirmative intent of Congress to waive the sovereign's immunity." 106 S.Ct. at 2965. This observation was made despite the fact that the fee statute in question (42 U.S.C. § 2000e–5(k)) provided that "the United States shall be liable for costs the same as a private party."

Not only does the language of the statute fail to provide support for plaintiffs' argument, but the legislative history also is completely silent on the subject of prejudgment interest. Although the Senate Report describes the objective of what was to become 42 U.S.C. § 1988 as giving "citizens ... the opportunity to recover what it costs them to vindicate [their civil rights] in court," S.Rep. No. 1011, 94th Cong., 2d Sess., *reprinted in* 1976 Code Cong. & Ad.News 5908, 5910, it makes only one oblique reference to the problem giving rise to prejudgment interest. And that reference is to a different solution. The reference is the following: "In appropriate circumstances, counsel fees under S. 2278 may be awarded pendente lite. *See Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (footnote omitted). Such awards are especially appropriate where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on all issues." *Id.* at 5912. In *Bradley* the Court, dealing with a complicated school desegregation case where many orders could be expected to issue over its course, said: "To delay a fee award until the entire litigation is concluded would work substantial hardship on plaintiffs and their counsel.... A district court must have discretion to award fees and costs incident to the final disposition of interim matters." 416 U.S. at 723, 94 S.Ct. at 2022. This specific mention of the possibility of interim fee awards to cushion the burden on plaintiffs seems to us to cut against any implication that the alternative approach of prejudgment interest was contemplated.

We recognize that a comparison of *Hutto v. Finney,* 437 U.S. at 696–99, 98 S.Ct. at 2576–78, and *Library of Congress,* 106 S.Ct. at 2963, suggests that the degree of congressional clarity required to abrogate the states' Eleventh Amendment immunity under § 1988 is less than that required to waive the federal government's sovereign immunity under Title VII. The apparent reason for the different standards of statutory interpretation is that while the Fourteenth Amendment limitation on the states' immunity is present in a § 1988 action, no similar constitutional limitation on sovereign immunity is present in a Title VII action against the federal government.

Yet where, as here, neither the statutory language nor the legislative history gives any basis for an inference that Congress actually intended to remove the states'

Eleventh Amendment immunity from substantial sums of prejudgment interest on attorneys' fee awards—or indeed that Congress even considered the question of prejudgment interest on such awards—we think that there is enough vitality in that Amendment to resist the inference. We are not happy about this result from a policy standpoint; indeed, particularly where private and unfunded counsel are expected to be enlisted to assist the private attorney general plaintiff, one can hardly overestimate the chilling effect of an interminable wait for payment in sharply shrunken dollars. The situation cries out for congressional remedy.

■ One ingenious remedy sought by plaintiffs, in the event that we upheld the Eleventh Amendment defense to current hourly rates, is to remand to the district court "to determine if present hourly rates should be applied, based on factors other than delay in payment, or to determine whether an upward adjustment of the lodestar figure is necessary to fully and fairly compensate the plaintiffs." (Appellees' Brief at 24.) We do not feel this route is viable. The district court specifically recognized "that upward adjustments of a lodestar figure for quality of representation and results obtained 'are to be few and far between.' *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 610 (1st Cir.1985); *see also Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Garrity v. Sununu*, 752 F.2d 727, 739 (1st Cir. 1984)." To these authorities we add *Pennsylvania v. Delaware Valley Citizens' Council*, —— U.S. ——, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986), with its warning:

> In short, the lodestar figure includes most, if not all, of the relevant factors comprising a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance. . . .

We add that although the Supreme Court heard reargument on whether fees "may be multiplied or otherwise enhanced to reflect the risk that plaintiffs might not have prevailed," 106 S.Ct. 3331 (1986), we do not view, in light of the early and continuing

success attained by plaintiffs in this case, such a risk here as to make this a "rare" or "exceptional" case. *Blum v. Stenson*, 465 U.S. 886, 898–901, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984); *Hall v. Ochs*, 817 F.2d 920 (1st Cir.1987).

The result of this reasoning is that we must replace the current (1986) hourly rates established by plaintiffs' credited expert Barshak with the historic rates he specified for the years 1975 through 1985 for the attorneys who represented the plaintiffs at trial, on appeal, and in the fee proceeding. As we shall later explain in more detail, this recalculation represents a total reduction of about 40 percent, from the district court's figure of approximately $1,470,000 to approximately $895,000.

### III. Lodestar Findings: Time and Rates

Having come this far, we now face a battery of specific criticisms of the district court's decision as to time spent and appropriate rates. This fee litigation has resulted in what the Court in *Hensley* warned against: "a second major litigation." 461 U.S. at 437, 103 S.Ct. at 1941. Although the Commonwealth has assured us that it has only taken seriously our advice in *Brewster v. Dukakis*, 786 F.2d 16, 19 (1st Cir.1986), to "mount[ ] challenges to specific claims," it has gone far beyond "target[ing] significant and vulnerable areas for testing." *Id.* The result is that we find ourselves confronting 200 pages of briefs, seven cartons of records, a transcript of a three-day trial, and dozens of exhibits.

There has been no effort to prioritize. The issue advanced by the Commonwealth that we deem the most meritorious, the Eleventh Amendment issue, was allowed only five pages in its 98–page main brief. In contrast, although plaintiffs' counsel quickly conceded error in the inclusion of a $26 charge for lunch, this item was alluded to in both brief and oral argument to demonstrate plaintiffs' counsels' irresponsibility. Apart from the "prevailing parties" issue, the Commonwealth aimed at some ten targets. We discuss them seriatim.

1. We are urged to disallow 50 percent of time allegedly spent between 1975 and mid–1977 (when we announced in *King v. Greenblatt*, 560 F.2d 1024 (1st Cir.1977), that contemporaneous time records should be kept) before detailed records were kept. The district court considered the evidence as to how plaintiffs' attorneys had reconstructed their time and found it reliable. The time allegedly spent by plaintiffs' lead attorney in these first three years (1,370 hours in 1975, 870 in 1976, and 1,164 in 1977—the heaviest years for him by far) do not seem shocking. Indeed, such a time investment was very similar to that testified to by the Commonwealth's lead counsel during the same period.

2. We are asked to make a 50 percent downward adjustment to reflect losing issues. Our prior discussion of the "prevailing parties" issue covers this point.

3. Rates should be set at figures testified to by defendants' consulting non-lawyer expert. The problem here is that the court specifically accepted the historic rates testified to by plaintiffs' lawyer expert.

The remaining criticisms are alike in that while most are very precise, a judgment of their accuracy requires us to accept defendants' witnesses' testimony and very often defendants' assumptions and unverified worksheets—contrary to the findings of the district court. We list them seriatim and then comment.

4. Deduct between 12 and 16 percent of the time of all of plaintiffs' counsel for duplicative efforts.

5. Deduct some 125 hours in 1977–1979 as being "noncompensable."

6. Deduct some 1663 hours between 1975 and 1979 as being "excessive."

7. Deduct some 446 hours between 1979 and 1984 as being "excessive."

8. Deduct 50 percent of costs to reflect expenses on losing issues.

9. Deduct for non-legal work and for non-core legal work.

10. Deduct for making exorbitant fee request.

Underlying Nos. 1, 2 and 4–9 is the theme that, contrary to the teaching of *Hensley v. Eckerhart*, 461 U.S. at 437, 103 S.Ct. at 1941, plaintiffs did not "exercise 'billing judgment' with respect to hours worked." In addition to the deletion we have noted of some 363 hours spent on discrete work related only to damages, plaintiffs also refrained from requesting compensation for time spent before the Supreme Judicial Court in connection with the *Roe* proceeding and for considerable time spent with their individual patient clients. It seems to us that the following statement by the Court in *Riverside v. Rivera* is applicable to the present case:

Petitioners maintain that respondents failed to exercise "billing judgment" in this case, since they sought compensation for all time spent litigating this case. We think this argument misreads the mandate of *Hensley*. *Hensley* requires a fee applicant to exercise "billing judgment" not because he should necessarily be compensated for less than the actual number of hours spent litigating a case, but because the hours he does seek compensation for must be *reasonable*. "Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary...." *Id.*, at 434, 103 S.Ct. at 1939. In this case, the District Court found that the number of hours expended by respondents' counsel was *reasonable*. Thus, counsel did, in fact, exercise the "billing judgment" recommended in *Hensley*.

*Riverside*, 106 S.Ct. at 2692 n. 4.

Indeed, we find it instructive to compare both the findings and asserted errors of judgment in *Riverside* with those of the present case. The eight findings of the district court in *Riverside*, as set out in Justice Powell's concurring opinion, are of the same general tenor as the six findings we have summarized. Indeed, they may be less detailed. *Riverside*, 106 S.Ct. at 2699 (Powell, J., concurring). The criticisms, voiced by then Justice Rehnquist in his dissent, parallel many of defendants' here: action of the court in awarding "to the

penny, the entire 'lodestar' claimed," approval of 209 hours of "prelitigation time"; 197 hours of time spent in conversations between plaintiffs' two attorneys; 143 hours in preparation of a pre-trial order; 45.50 hours of "stand-by time" for an attorney awaiting a jury verdict. *Riverside*, 106 S.Ct. at 2702–03 (Rehnquist, J., dissenting). Even Justice Rehnquist, however, might have been less critical in the case at bar for this, in contrast to *Riverside*, is the kind of case he would find meritorious under *Hensley*'s description—"complex civil rights litigation involving numerous challenges to institutional practices or conditions" justifying a large award. *Riverside*, 106 S.Ct. at 2705 (Rehnquist, J., dissenting).

A further problem with such an indiscriminate targeting of manifold alleged errors is that the cumulative result places a palpable strain on our credulity. We have attempted to price defendants' criticisms, by accepting their figures, extrapolating them, and applying hourly rates to time that should allegedly be deducted. Our calculations are admittedly not exact, for defendants have not specified the rates to be applied to hours which they urge be deducted, nor have we been given information as to whether the deductions urged overlap or are cumulative. So what we have calculated may well be a "worst case scenario." But we think it illuminative of defendants' problem of lack of focus. If the defendants' historical hourly rates are accepted, plaintiffs' total attorneys' fees and costs for the twelve-year period would be slightly over $11,000. If the plaintiffs' historical hourly rates were to be applied, the total deductions would exceed the $895,000 figure of total time claimed at historical hourly rates by some $25,000.

■ We do not mean to imply that the district court scrutiny was as helpful as it could have been or that there was no basis for effective criticism. What we do say is that the realities of fee award reviews compel those who would object to such awards on appeal on the basis of time spent to select priority targets and marshal the facts as effectively as possible. To a far greater extent than is true of discrete legal issues, the battle is likely to be determined in the trial court.

■ Having said all this critically, we address more favorably the Commonwealth's criticism of fees attributed to the fee litigation itself—some 1,110 hours, or over one tenth of all time claimed. The time is claimed not only by Cole and Burdick, the Greater Boston Legal Services counsel, but their outside counsel, Bergstresser, and ultimately two specially retained fee counsel, Simonds and Simons.[4] Considerable time was spent by the first two in reconstructing their records between 1975 and mid-1977, as well as in briefing outside counsel, and in attending hearings and depositions. In contrast to the billing judgment plaintiffs demonstrated by eliminating time spent on the damage claims from their fee request, plaintiffs apparently did not eliminate any duplicative hours spent on fee litigation. We have a deep conviction that, contrary to the finding of the district court, the fee requests included some duplicative and non-compensable effort, stemming from the ambiguity created when counsel become clients. *Cf. White v. City of Richmond*, 559 F.Supp. 127, 131 (N.D.Cal.1982). Defendants have suggested that 195.22 hours be disallowed from the time claimed by Cole, Burdick and Bergstresser. We approximate this by exacting a 20 percent reduction of the time claimed by each at 1985 rates. The compensation is:

the district courts in the absence of good cause.

---

4. Although in this unusual case the engagement of specially retained fee counsel seems appropriate, such a practice is inherently wasteful in many respects and should not be encouraged by

| Attorney | Hours | 1985 Rates | Total | 20% Reduction |
|---|---|---|---|---|
| Cole | 565.95 | 125 | 70,743.75 | 14,148.75 |
| Burdick | 61.95 | 125 | 7,743.75 | 1,548.75 |
| Bergstresser | 306.05 | 145 | 44,377.25 | 8,875.45 |
| | | | Total Reduction | $24,572.95 |

## IV. Computation and Conclusion

We have asked ourselves whether we should remand the case to the district court to perform the actual computations. We conclude that this would be of service neither to that court nor the parties. Accordingly, we have undertaken this function, as we did in *Hart v. Bourque*, 798 F.2d 519 (1st Cir.1986), and in *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir.1984).

In accordance with the foregoing we have rejected the then current hourly rates used by the district court, and have applied the historical rates testified to by plaintiffs' expert, Attorney Barshak, to the time claimed in Exhibits 44, 46, 48, and 49 submitted at the hearing on fees. Where he has given one figure for the beginning year of a period and another for the ending year of that period (e.g., 1980–1985), we have extrapolated. And we have done some rounding. As we have already noted, we find the total "lodestar" fees (time spent multiplied by historical hourly rates) plus costs to be $895,076.32. From this we deduct, for excessive charges for the fee litigation, $24,572.95. The net total award is therefore $870,503.37.

Following the order used by the district court, we report the following:

1. For Greater Boston Legal Services, — $673,925.07
 a. $450,000 for all the work of Richard Cole less $14,148.75 reduction for fee litigation. — $435,851.25
 b. $225,000 for all the work of Robert Burdick less $1,548.75 reduction for fee litigation. — $223,451.25
 c. Costs in the amount of $14,622.57 (total costs of $28,527.24 minus $13,904.67 in costs paid to date). — $ 14,622.57
2. For Stahlin and Bergstresser, — $172,709.23
 a. $170,000 for all the work of Clyde D. Bergstreser less $8,875.45 reduction for fee litigation. — $161,124.55
 b. $6,695 for the work of members of Bergstresser and Stahlin. — $ 6,695.00
 c. Costs in the amount of $4,889.68 (Total costs of $5,485.01 minus $595.33 in costs paid to date). — $ 4,889.68

3. For Goodwin, Procter and Hoar, — $ 23,869.07
 a. $16,765.00 for the work of Marshall Simonds (95.80 hours at the rate of $175.00 per hour). — $ 16,765.00
 b. $5,286.75 for the work of Kenneth Simons (79.50 hours at the rate of $66.50 per hour). — $ 5,286.75
 c. Costs in the amount of $1,817.32. — $ 1,817.32
 Total fees and costs allowed: — $870,503.37

*The judgment is vacated and the matter remanded to the district court for an appropriate order consistent with this opinion.*