**Annabelle LIPSETT, Plaintiff, Appellee,**

**v.**

**Gumersindo BLANCO, et al., Defendants, Appellants.**

**No. 91–2152.**

United States Court of Appeals, First Circuit.

Heard April 7, 1992.

Decided Sept. 23, 1992.

James D. Noel, III, with whom Ledesma, Palou & Miranda, Hato Rey, P.R., were on brief, for defendants, appellants.

Judith Berkan, Santurce, P.R., with whom Charles S. Hey Maestre, Rio Piedras, P.R., and Janice M. Gutierrez Lacourt, Hato Rey, P.R., were on brief, for plaintiff, appellee.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOYLE,[*] District Judge.

SELYA, Circuit Judge.

In what promises to be the last trek of a long safari of a case, we are asked to ascertain whether the district court abused its discretion in awarding $678,425.25 to the prevailing plaintiff under the Fees Act, 42 U.S.C. § 1988 (1988). Finding that the bestowal of attorneys' fees was overgenerous in certain respects, we reduce the award.

I. OVERVIEW

Because the merits of this case are no longer in issue and appellants concede that the plaintiff prevailed, we need not rehearse the facts. Rather, we offer an overview of what has transpired to date, referring the reader who may hunger for exegetic detail to the myriad of published opinions chronicling the snail's-pace progress of the underlying litigation.[1]

Plaintiff-appellee Annabelle Lipsett entered the surgical residency program (Program) at the University of Puerto Rico School of Medicine (UPR) in July, 1980. She successfully completed her first year. Lipsett's second and third years in the Program were rife with controversy, culminating in the involuntary termination of her residency, effective June 30, 1983.

Lipsett promptly instituted a civil rights action in federal district court. She alleged, *inter alia*, gender-based discrimination and sexual harassment. The initial roster of defendants included the present appellants, Gumersindo Blanco, Jose R. Gonzalez–Inclan, and Pedro Juan Santiago–Borrero.[2] Several other persons and institutions were sued along the way, but over time, the number of defendants dwindled.

When Lipsett's case was finally tried, the jury found appellants liable for what had befallen to the tune of $525,000 in damages. The district court rejected appellants' post-trial motions for judgment n.o.v. or a new trial and, at the same time, denied appellee's post-trial motion for equitable

---

[*] Chief Judge, United States District Court for the District of Rhode Island, sitting by designation.

1. *See, e.g., Lipsett v. UPR*, 864 F.2d 881 (1st Cir.1988); *Lipsett v. UPR*, 759 F.Supp. 40 (D.P.R. 1991); *Lipsett v. UPR*, 745 F.Supp. 793 (D.P.R. 1990); *Lipsett v. Rive–Mora*, 669 F.Supp. 1188 (D.P.R.1987); *Lipsett v. UPR*, 637 F.Supp. 789 (D.P.R.1986); *Lipsett v. UPR*, 576 F.Supp. 1217 (D.P.R.1983).

2. *During the years 1981 through 1983, Blanco was director of the department of surgery and chair of UPR's array of residency training programs; Gonzalez–Inclan was acting director of the surgical residency program; and Santiago–Borrero was the dean of the medical school.*

relief. *See Lipsett v. UPR,* 759 F.Supp. 40 (D.P.R.1991). The court subsequently awarded Lipsett attorneys' fees and costs pursuant to 42 U.S.C. § 1988. *Lipsett v. UPR,* Civ. No. 83–1516 (D.P.R. Sept. 10, 1991) (*Fees Op.*). This appeal followed.

## II. THE LEGAL LANDSCAPE

 Ordinarily, the trial court's starting point in fee-shifting cases is to calculate a lodestar; that is, to determine the base amount of the fee to which the prevailing party is entitled by multiplying the number of hours productively expended by counsel times a reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Typically, a court proceeds to compute the lodestar amount by ascertaining the time counsel actually spent on the case "and then subtract[ing] from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). The court then applies hourly rates to the constituent tasks, taking into account the "prevailing rates in the community for comparably qualified attorneys." *United States v. Metropolitan Dist. Comm'n,* 847 F.2d 12, 19 (1st Cir.1988); *see also Grendel's Den,* 749 F.2d at 955. Once established, the lodestar represents a presumptively reasonable fee, although it is subject to upward or downward adjustment in certain circumstances. *See Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

 On appeal, a fee award is reviewable only for mistake of law or abuse of discretion. *See Foley v. City of Lowell,* 948 F.2d 10, 18 (1st Cir.1991); *Wojtkowski v. Cade,* 725 F.2d 127, 130 (1st Cir.1984). The trial court's discretion in respect to fee awards is extremely broad. *See, e.g., Foley,* 948 F.2d at 19; *Metropolitan Dist. Comm'n,* 847 F.2d at 14. Because this is so, and because determination of the extent of a reasonable fee necessarily involves a series of judgment calls, an appellate court is far more likely to defer to the trial court in reviewing fee computations than in

many other situations. *See Rogers v. Okin,* 821 F.2d 22, 30 (1st Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988).

## III. ANALYSIS

In this instance, the district court set the lodestar amount at $552,439 and then increased the amount to $678,425.25. Appellants say that this award reflects a cavalcade of errors. Their plaints fit into two categories. The first category consists of a series of challenges to the lodestar computation itself. The second category consists of allegations that enhancement was unjustified. We consider each category in turn.

### A. *Calculation of the Lodestar.*

For purposes of discussion, we subdivide this cluster of grievances into four components.

1. *Recordkeeping.* Appellants single out certain time records and assail the manner in which Lipsett's attorneys maintained them. They argue that these records failed to satisfy the relevant legal standard because, in some instances, the entries were not inscribed at the same time the work was performed and, in other instances, the entries were too general.

*a.*

It is important to note that the records at issue here are not subject to a single, uniform standard. Prior to 1985, we required that fee-seeking attorneys submit billing records sufficient to comprise a meaningful accounting of time expended. We warned that "bills which simply list a certain number of hours and lack such important specifics as dates and the nature of the work performed during the hour or hours in question should be refused." *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir. 1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *accord Souza v. Southworth,* 564 F.2d 609, 612 (1st Cir.1977). Under this standard, the records need not have been created contemporaneously with the lawyer's performance of the recorded task. *See Grendel's Den,* 749

F.2d at 951–52 (allowing recovery of fees under the *King* standard for hours expended before 1985 although the fee-seeking attorneys had not maintained contemporaneous time records).

On December 5, 1984, we announced a new, less forgiving standard: "Henceforth, in cases involving fee applications for services rendered after the date of this opinion, the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." *Id.* at 952. Because the new rule was not meant to apply retroactively, *Calhoun v. Acme Cleveland Corp.*, 801 F.2d 558, 560–61 (1st Cir.1986), the *King* standard applies to the pre–1985 billing records in this case and the *Grendel's Den* standard applies to the post–1984 billing records.[3]

### b.

We find no abuse of discretion in the district court's acceptance of the records presented under the *King* regime. These submissions adequately limn the different tasks performed, the nature of the work, the time consumed, and the dates when effort was expended. In sum, the pre–1985 time records, overall, fell sufficiently within the general parameters of the *King* standard that the district court, in the exercise of its informed discretion, could appropriately credit them. While many of the records are not models of clarity, the *King* regime did not require either exhaustive detail or infinite precision.

### c.

The billing records submitted for tasks completed after 1984 are more of a mixed bag. Although most of those records pass muster under the heightened *Grendel's Den* standard, appellants have directed our attention to several entries containing only

gauzy generalities. These entries—which total 81.2 hours[4]—are so nebulous that they fail to "allow[ ] the paying party to dispute the accuracy of the records as well as the reasonableness of the time spent." *Calhoun*, 801 F.2d at 560. Accordingly, the entries should have been substantially discounted. *See Grendel's Den*, 749 F.2d at 952.

■ *2. Overstaffing.* Appellants also claim that the plaintiff overstaffed the case. Specifically, appellants claim that Marilucy Gonzalez, an attorney, and Nelly Rivera Marrero, a paralegal, were excess baggage at trial. Lipsett defends the presence of multiple lawyers, plus a paralegal, asserting that a larger-than-average legal team was desirable due to the complex nature of the case and the reams of evidence which needed to be tracked and analyzed. After examining these conflicting claims, the court below found the challenged staffing practices were reasonable. Although we think the district judge was guilty of hyperbole in characterizing the populous staffing as "unavoidable," we see no basis for disturbing his core finding that the staffing was "reasonable."

As a general matter, "the time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted.'" *Hart v. Bourque*, 798 F.2d 519, 523 (1st Cir.1986) (quoting *King*, 560 F.2d at 1027); *accord Grendel's Den*, 749 F.2d at 953. Fee-shifting statutes are designed to "ensure effective access to the judicial process for persons with civil rights grievances," *Hensley*, 461 U.S. at 429, 103 S.Ct. at 1937 (citation and internal quotation marks omitted), not to serve as full employment or continuing education programs for lawyers and paralegals. A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism. *See United Nuclear Corp. v. Cannon*, 564

---

3. We use the euphemisms "pre–1985" and "post–1984" in reference to billing records which, respectively, predate and postdate the publication of our opinion in *Grendel's Den* (December 5, 1984).

4. The entries in question include 16.7 hours of Attorney Berkan's time; 8.75 hours of Attorney Lugo's time; 26.4 hours of Attorney Hey Maestre's time; 19.7 hours of Attorney Vicente's time; 5.65 hours of Attorney Gonzalez's time; and 4 hours expended by a paralegal, Nelly Rivera Marrero.

F.Supp. 581, 590 (D.R.I.1983) (suggesting that, in fee-shifting milieu, district courts "must zealously guard against any propensity to over-staff litigation"). In the last analysis, however, staffing issues are often best resolved by the trial court's application of its intimate, first-hand knowledge of a particular case's nuances and idiosyncracies. *See, e.g., Wagenmann v. Adams,* 829 F.2d 196, 224–25 (1st Cir.1987).

This case was bitterly contested. Appellants mounted a Stalingrad defense, resisting Lipsett at every turn and forcing her to win her hard-earned victory from rock to rock and from tree to tree. Since a litigant's staffing needs often vary in direct proportion to the ferocity of her adversaries' handling of the case, this factor weighs heavily in the balance. The record reflects that the court below carefully considered the parties' importunings in light of the relevant policies and precedents, concluding that the staffing, though abundant, was "reasonable and necessary given the nature of the case." Keeping in mind the complexity of the litigation, the considerable burdens it placed upon plaintiff's counsel, the number of defendants, and the defense's formidable staffing patterns, we decline to interfere with Judge Pieras' assessment of the situation. *See generally Metropolitan District Comm'n,* 847 F.2d at 18 (refusing to second-guess interstitial determinations in the computation of a fee award "if the trial judge's determinations seem plausible, given what has transpired in the litigation"); *Wagenmann,* 829 F.2d at 224 (hesitating, in the same context, to "nitpick what are essentially factual matters"); *Johnson v. University College of the Univ. of Ala.,* 706 F.2d 1205, 1208 (11th Cir.) ("The retaining of multiple attorneys in a significant, lengthy employment discrimination case ... is understandable and not a ground for reducing the hours

claimed."), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983).

3. *Clerical Tasks/Professional Rates.* Appellants isolate certain hours which Lipsett's paralegals and lawyers billed at their customary rates, but which appellants claim involve clerical tasks. We bifurcate our analysis of this contention, treating paralegals and lawyers separately.

*a.*

 We begin by considering 24.95 hours attributed to paralegals—hours that appellants urge were improperly factored into the fee award. The efficient use of paralegals is, by now, an accepted cost-saving device. Recognizing this reality, courts generally allow hours reasonably and productively expended by paralegals in civil rights litigation to be compensated at market rates when constructing fee awards.[5] *See Jacobs v. Mancuso,* 825 F.2d 559, 563 & n. 6 (1st Cir.1987); *United Nuclear,* 564 F.Supp. at 589–90 & n. 6. The Supreme Court has given its blessing to such a practice, stating: "By encouraging the use of lower cost paralegals rather than attorneys wherever possible, permitting market-rate billing of paralegal hours encourages cost-effective delivery of legal services and, by reducing the spiraling cost of civil rights litigation, furthers the policies underlying civil rights statutes." *Missouri v. Jenkins,* 491 U.S. 274, 288, 109 S.Ct. 2463, 2471, 105 L.Ed.2d 229 (1989) (citation and internal quotation marks omitted).

In setting fees, the district court has broad discretion to determine "how much was done, who did it, and how effectively the result was accomplished." *Wagenmann,* 829 F.2d at 224. Having reviewed the disputed entries in light of this principle, we find that the paralegal fees were properly assessed. The tasks performed—

---

5. Whether paralegal hours may be billed at a market rate ultimately depends upon whether such a practice is common in the relevant legal market. *See Missouri v. Jenkins,* 491 U.S. 274, 288, 109 S.Ct. 2463, 2471, 105 L.Ed.2d 229 (1989). In this case, appellants have not contended that market-rate billing of paralegal hours was uncommon in Puerto Rico at the

time of this litigation. Hence, we deem any such contention waived. *See Fournier v. Best W. Treasure Island Resort,* 962 F.2d 126, 127 (1st Cir.1992) (issues neither briefed nor argued are waived); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (same), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

filing motions, translating depositions, and the like—fell into the gray area between purely clerical tasks and those properly entrusted to a paralegal. It is precisely in such gray areas that the district court's judgment carries the greatest weight. In this instance, moreover, the judge allowed the hours but pruned the reimbursement rate by forty percent (from $50/hr. to $30/hr.). In the totality of the circumstances, we discern no abuse of discretion in respect to the court's judicious handling of the contested hours.

*b.*

■■■ We turn next to 10.6 hours which appellants asseverate were improperly charged as attorneys' time. We agree with appellants' basic premise: clerical or secretarial tasks ought not to be billed at lawyers' rates, even if a lawyer performs them. *See Jenkins*, 491 U.S. at 288 n. 10, 109 S.Ct. at 2471 n. 10; *Action on Smoking & Health v. Civil Aeronautics Bd.*, 724 F.2d 211, 222 (D.C.Cir.1984).

We also agree with the conclusion that appellants draw from this premise. The disputed hours involve nothing more than translations of documents and court filings. The district court allowed this time to be compensated at a rate of $150/hr. That rate is incommensurate to the nature of the tasks. The hours should not be completely eliminated but should be compensated at a less extravagant rate. *See Jenkins*, 491 U.S. at 288 n. 10, 109 S.Ct. at 2471 n. 10.

■■■ 4. *Interrelated Claims.* Appellants launch several broadsides directed at hours that were allegedly excessive because they were expended on claims that were ultimately unsuccessful. For example, appellants contend that, because the plaintiff did not prevail on her requests for reinstatement and other equitable relief, her attorneys' fees should be decreased by twenty percent.[6] Similarly, appellants calumnize the district court's allowance of time spent by plaintiff's legal team in jousting with those defendants who managed to

escape liability and in fruitlessly pursuing a procedural due process claim. Because we find no abuse of discretion in the trial court's determination that the work done on these unsuccessful claims was sufficiently interconnected with the causes of action upon which appellee prevailed, we refuse to grant the requested reductions.

■■■ Once a court determines that a party has prevailed within the terms of a fee-shifting statute,

> the question becomes whether the claims on which [she] lost in the same suit were *unrelated* to the successful ones (in which event no fees may be awarded for the work on the unsuccessful claims), or whether, instead, the losing claims included "a common core of facts" or were "based on related legal theories" linking them to the successful claim. In the latter event, the award may include compensation for legal work performed on the unsuccessful claims.

*Garrity v. Sununu*, 752 F.2d 727, 734 (1st Cir.1984) (quoting *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940). We have reaffirmed this doctrine of interrelatedness on numerous occasions. *See, e.g., Domegan v. Ponte*, 972 F.2d 401, 419 (1st Cir.1992); *Nydam v. Lennerton*, 948 F.2d 808, 812 (1st Cir.1991); *Culebras Enterps. Corp. v. Rivera–Rios*, 846 F.2d 94, 102 (1st Cir. 1988); *Wagenmann*, 829 F.2d at 225; *Aubin v. Fudala*, 782 F.2d 287, 291 (1st Cir. 1986). In doing so, we have noted that "the extent of a plaintiff's success in a civil rights suit is a practical question, involving a qualitative, as well as quantitative, judgment." *Aubin*, 782 F.2d at 290. In such cases, "[t]he fee should not be derived through any mechanical formula. It is an equitable judgment entrusted to the discretion of the factfinder, to be made on the basis of all the circumstances of the litigation." *General Dynamics Corp. v. Horrigan*, 848 F.2d 321, 325 (1st Cir.) (citations omitted), *cert. denied*, 488 U.S. 992, 109 S.Ct. 554, 102 L.Ed.2d 581 (1988). Furthermore, "[w]here it would be an 'exercise in

---

**6.** It is unclear how appellants arrived at this percentage, short of plucking the number out of

thin air.

futility' to separate out the legal services rendered for each claim, the fee should simply be determined as a function of degree of success." *Id.* (quoting *Garrity*, 752 F.2d at 735); *cf. Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940 (at bottom, "[t]he result is what matters"). If the fee-seeker properly documents her claim and plausibly asserts that the time cannot be allocated between successful and unsuccessful claims, it becomes the fee-target's burden to show a basis for segregability.

In reviewing determinations that claims are or are not interrelated for purposes of an award of attorneys' fees, we have exhibited great deference to the trial court's discretion. *See Domegan*, 972 F.2d at 423. This deference is motivated by our conviction that "the decision as to how to separate the wheat from the chaff in a fees contest, within broad limits, is a matter for the district court's discretion." *Metropolitan Dist. Comm'n*, 847 F.2d at 17. It is the district judge, not his or her appellate colleagues, who has "had a frontrow seat at the trial and before." *Wagenmann*, 829 F.2d at 225.

In this case, we are unmoved by appellants' conclusory allegation that a large portion of the fee award was undeserved because many of the compensated hours were actually expended on claims unrelated to the claims on which plaintiff succeeded. For one thing, appellants have done little to carry their burden of showing that hours which the district court found to be hopelessly blended were in fact segregable. For another thing, the hours devoted to the procedural due process violation, the claims against the dismissed defendants, and the request for injunctive relief involved, by and large, a tightly wrapped core of common facts shared with the claims upon which the plaintiff prevailed—a circumstance that lends great credibility to the district court's decision.

We will not paint the lily. Lipsett's stunning victory and the series of minor setbacks suffered en route to that victory arose out of a single series of events. It is beyond question that the end result represented a pronounced legal and pecuniary triumph for her. In the process, she prevailed on her most significant claims. When interrelatedness is in question, the overall degree of the prevailing party's success is an important datum. *See Garrity*, 752 F.2d at 734; *see also Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. Moreover, the district court wrote a thorough and detailed opinion reviewing the imbrication between the successful and unsuccessful claims. *See Fees Op.* at 18–22. The court's words carry considerable convictive force. Although we, if writing on a pristine page, might have been more miserly, we are constrained in this instance to defer to the trial court's determination that the requisite linkage was forged. *See Wagenmann*, 829 F.2d at 225 (holding that a refusal to separate out time spent on distinct claims is within the trial court's discretion if the claims are "so factually imbricated ... as to make separate treatment of the constituent attorney time inappropriate").

Before leaving this terrain, we feel impelled to recognize a mathematical anomaly. The lodestar, as we compute it, yields more dollars for counsel ($545,281.37) than the damage award yields for plaintiff ($525,000). In the ordinary course of events, one would not expect a fee award to outpace a substantial award of money damages. In this instance, the discrepancy is explained largely by what we have referred to as the "Stalingrad defense." While this hard-nosed approach to litigation may be viewed as effective trench warfare, it must be pointed out that such tactics have a significant downside. The defendants suffer the adverse effects of that downside here. There is a corollary to the duty to defend to the utmost—the duty to take care to resolve litigation on terms that are, overall, the most favorable to a lawyer's client. Although tension exists between the two duties, they apply concurrently. When attorneys blindly pursue the former, their chosen course of action may sometimes prove to be at the expense of the latter.

### B. *Enhancement of the Lodestar.*

██ The district court applied a fifty percent multiplier to a portion of the attor-

neys' hours. Judge Pieras gave two reasons. First, he cited the quality of service (extremely high) and the degree of success (very great). Second, he found that the lawyers' fees were contingent on success and that the aleatory nature of the engagement warranted an enhancement to compensate for the risk of nonpayment. We approach this phase of our inquiry mindful that determining whether a particular type of enhancement to a lodestar is legally viable involves mainly a question of law. Thus, appellate review of such determinations is plenary.[7] *See, e.g., Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 457 (1st Cir.1992) (holding that claimed "errors of law are subject to plenary review"); *Brewer v. Madigan,* 945 F.2d 449, 452 (1st Cir.1991) (same).

▮ 1. *Exceptional Performance/Results Enhancement.* The Supreme Court has stated that, in some cases, the lodestar may not actually represent a reasonable attorneys' fee, and thus, may require upward adjustment. *See Blum,* 465 U.S. at 897, 104 S.Ct. at 1548; *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. But, we have repeatedly cautioned that such enhancements will be rare. *See, e.g., Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 610 (1st Cir. 1985). The exception is a tiny one—and we will not permit it to eclipse the rule.

While some precedent holds out the possibility of enhancing the lodestar for exceptional performance and results, *see, e.g., Blum,* 465 U.S. at 896–901, 104 S.Ct. at 1547–1550; *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940; *Conservation Law Found. of N.E., Inc. v. Secretary of the Interior,* 790 F.2d 965, 971 (1st Cir.1986); *Wildman,* 771 F.2d at 610, more recent cases go a long way toward dampening this option. For example, in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*), the Supreme Court counselled:

> Because considerations concerning the quality of a prevailing counsel's representation normally are reflected in the reasonable hourly rate, the overall performance ordinarily should not be used to adjust the lodestar, thus removing any danger of "double counting."

*Id.* at 566, 106 S.Ct. at 3098. In the same case, Justice White wrote that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorneys' fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance." *Id.* Thereafter, we ventured to say that *Delaware Valley I* made "clear that adjustments are not to be given in reward for stellar performance." *Hall v. Ochs,* 817 F.2d 920, 929 (1st Cir.1987).

To be sure, both *Delaware Valley I* and *Hall* contain language intimating that there exists a strong presumption, not an outright ban, against exceptional performance/results enhancements. *See Delaware Valley I,* 478 U.S. at 566, 106 S.Ct. at 3098 ("[O]verall performance *ordinarily* should not be used to adjust the lodestar....") (emphasis supplied); *Hall,* 817 F.2d at 929 ("[E]xceptional performance is *generally* a function of the competence and experience that is reflected in the reasonable hourly rate....") (emphasis supplied). We have no occasion to probe these hypothetical possibilities today. Even if there may be some few cases where a combination of sterling performance and exceptional results could conceivably justify a premium fee, this case would not fulfill the necessary criteria.

The court below awarded full, current rates to Lipsett's counsel—rates which we believe adequately reflected the lawyers' superior skills and the superb results obtained. Although we do not gainsay either the strength of the attorneys' performance

---

7. If, however, the theory behind an enhancement is categorically acceptable, the district court's finding that the case itself fits factually within the subject category, or fails so to qualify, is reviewed under a more deferential standard. *See Blum,* 465 U.S. at 896–902, 104 S.Ct. at 1547 (reviewing lodestar enhancement for abuse of discretion); *Jones v. Central Soya Co.,* 748 F.2d 586, 589–91 (11th Cir.1984) (reviewing denial of lodestar enhancement on an abuse-of-discretion standard).

or the magnitude of their triumph, we see nothing in the record that indicates that the services and results overshadowed, or somehow dwarfed, the lodestar. In short, the lodestar fee, unembellished, represented the reasonable attorneys' fee assured by section 1988. Thus, an enhancement cannot be justified on the grounds of exceptional service and results.

 2. *Contingency Enhancement.* At the time this case was decided below, this circuit allowed enhancement for risk of nonpayment in exceptional contingent-fee cases if certain criteria were met. *See Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 564 (1st Cir.), *cert. denied,* 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988); *Wildman,* 771 F.2d at 614. In its most recent pronouncement on the subject, however, the High Court has effectively foreclosed such enhancements, ruling that "enhancement for contingency [under fee-shifting statutes] is not permitted." *City of Burlington v. Dague,* —— U.S. ——, ——, 112 S.Ct. 2638, 2643, 120 L.Ed.2d 449 (1992). That ends the matter. Although the federal fee-shifting statutes at issue in *Dague* were provisions of the Solid Waste Disposal Act and Clean Water Act, respectively, the Court's reasoning applies full bore to the Fees Act, 42 U.S.C. § 1988, a fee-shifting statute which, in the Court's words, contains "language … similar to" the statutes at issue in *Dague.* —— U.S. at ——, 112 S.Ct. at 2641. We hold, therefore, that when a prevailing party seeks an attorneys' fee award in a civil rights case in pursuance of the Fees Act, enhancement of the lodestar because of counsel's risk of nonpayment is not permitted.

This ruling brings down the final curtain on plaintiff's attempt to retain the enhancement awarded by the court below. In granting the enhancement, the court reasoned that "these attorneys would not have received any payment had the suit not been successful." The Supreme Court has now made it pellucidly clear, however, that such risks should play no part in enhancing a lodestar fee. To the extent that the risk stems from "the legal and factual merits of the claim, … the consequence of awarding contingency enhancement … would be to provide attorneys with the same incentive to bring relatively meritless claims as relatively meritorious ones." *Id.* —— U.S. at ——–——, 112 S.Ct. at 2641–42. Thus, insofar as the lower court's enhancement accounted for the risk of nonpayment, its decision created precisely the kind of skewed incentive that the Supreme Court has flatly rejected. By the same token, to the extent that the risk of loss can be attributed to the "difficulty of establishing" the merits of the claim, this difficulty is already "reflected in the lodestar." *Id.* —— U.S. at ——, 112 S.Ct. at 2641.

3. *Summary of Enhancement Issues.* We decline the temptation to cart coal to Newcastle. In this case, the lodestar, properly computed, exceeded half a million dollars. That substantial figure fully accounted for (a) the time and skill needed to address the rigors of this admittedly complex case, (b) the significant victory the plaintiff achieved, and (c) the contingent nature of the attorneys' employment. Whether we take the district court's rationales together or separately, we must conclude that the court erred in enhancing the lodestar.

## IV. REMEDY

 It is often the case that an improper calculation of attorneys' fees necessitates remand for reconfiguration of the award—but that is not always true. Where, as here, the record is sufficiently developed that we can apply the law to the facts before us and calculate a fair and reasonable fee without resorting to remand, that route is available to us. *See Foster v. Mydas Assocs., Inc.,* 943 F.2d 139, 141 n. 4, 144 n. 8 (1st Cir.1991); *Jacobs,* 825 F.2d at 562; *Hart,* 798 F.2d at 523; *Grendel's Den,* 749 F.2d at 951. Mindful, as we are, of the Court's admonition that a "request for attorney's fees should not result in a second major litigation," *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941, we believe that this case lends itself to such an approach. After careful consideration, we have decided that we need not remand this case to perform the essentially mechanical task of implementing our rul-

ings. We conclude, therefore, with an accounting of our handiwork.[8]

The disputed post–1984 recordkeeping hours, Part III(A)(1)(c), *supra,* should be slashed by fifty percent, amounting to a decrease of $5885.63 in the award. The disputed pseudo-clerical hours, Part III(A)(3)(b), *supra,* should be charged at a reduced rate equal to the paralegal rate ($30 per hour), thereby diminishing the award by $1,272. The entire amount of the enhancement, Part III(B), *supra,* should be subtracted, amounting to a further decrease of $125,986.25.

We need go no further. Appellants' remaining arguments do not warrant discussion. As explained above, we reduce the fee award from $678,425.25 to $545,281.37. In all other respects, the award may stand. Interest shall accrue on the modified judgment as provided by 28 U.S.C. § 1961 (1988). *See Foley,* 948 F.2d at 22. No fees or costs shall be payable to or by any party with respect to services rendered in connection with this appeal.

*Affirmed as modified. No costs.*

---

**8.** On appeal, appellants have not challenged the district court's lodestar-related rate determinations (which range from $50/hr. to $175/hr. for the various attorneys and $30/hr. for the paralegal). We have applied these hourly rates in our revision of the award.