July 7, 1995 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



Nos. 94-1156, 94-1164, 94-1409, 94-1414, 94-1422, 94-1423,
94-1426, 94-1427, 94-1430, 94-1438, 94-1439, 94-1440,
94-1442

IN RE: THIRTEEN APPEALS ARISING OUT OF THE

SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION.



ERRATA SHEET

The opinion of this Court issued May 31, 1995, is ammended
as follows:

Delete cases #94-1430 and #94-1442 from the Court's opinion
and judgement of May 31, 1995.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



Nos. 94-1156, 94-1164, 94-1409, 94-1414, 94-1422, 94-1423,
94-1426, 94-1427, 94-1438, 94-1439, 94-1440

IN RE: THIRTEEN APPEALS ARISING OUT OF THE

SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION.



APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Bownes, Senior Circuit Judge, 

and Cyr, Circuit Judge. 


Judith Resnik, with whom Dennis E. Curtis, Richard A. 
Bieder, and Koskoff, Koskoff & Bieder, P.C., were on brief, for 
appellants Bieder, et al.
Jose E. Fernandez-Sein on brief for appellant Nachman. 
Steven C. Lausell, with whom Jimenez, Graffam & Lausell was 
on brief, for appellee Jimenez, Graffam & Lausell.
Will Kemp, with whom Stanley Chesley, Wendell Gauthier, John 
Cummings, David Indiano and Harrison, Kemp & Jones, Chtd. were on 
brief, for remaining appellees.



May 31, 1995



SELYA, Circuit Judge. These appeals require us to SELYA, Circuit Judge. 

revisit the war zone where two groups of plaintiffs' lawyers have

struggled over the proposed allocation of roughly $68,000,000 in

attorneys' fees. One camp, dissatisfied with the district

court's latest formula for distributing the fees, attacks the

court's order on three fronts. The disgruntled lawyers contend

that the district court (1) violated their due process rights,

(2) used an improper method to determine the awards, and (3)

divided the available monies in an arbitrary and unreasonable

manner. We find appellants' first two plaints to be without

merit, but we agree with them that allocating 70% of the fees to

the appellees constituted an abuse of the trial court's

discretion. And, because we are reluctant to prolong a matter

that, like the proverbial cat, seems to have nine lives, we take

matters into our own hands and reconfigure the fee awards.

I. BACKGROUND I. BACKGROUND

The lay of the land is familiar. We explored much the

same terrain in an earlier encounter, see In re Nineteen Appeals 

Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 

603 (1st Cir. 1992), and a plethora of opinions describing the

details of the underlying litigation pockmark the pages of the

Federal Reports, see, e.g., id. at 605 n.1 (offering partial 

listing). Thus, a brief overview of the litigation will suffice.

In 1987, the Judicial Panel on Multidistrict Litigation

consolidated over 270 cases arising out of the calamitous

conflagration that had ravaged the San Juan Dupont Plaza Hotel on

3

the evening of December 31, 1986. See In re Fire Disaster at 

Dupont Plaza Hotel, 660 F. Supp. 982 (J.P.M.L. 1987) (per 

curiam). The designated trial judge, Hon. Raymond L. Acosta,

handpicked certain attorneys, denominated collectively as the

Plaintiffs' Steering Committee (PSC), to act as lead and liaison

counsel for the plaintiffs. In Nineteen Appeals, we summarized 

the roles played by the PSC and the individually retained

plaintiffs' attorneys (IRPAs), respectively:

The PSC members looked after the big picture:
mapping the overarching discovery, trial, and
settlement strategies and coordinating the
implementation of those strategies. The
IRPAs handled individual client communication
and other case-specific tasks such as
answering interrogatories addressed to
particular plaintiffs, preparing and
attending the depositions of their clients,
and taking depositions which bore on damages.
The IRPAs also worked with Judge Bechtle [the
"settlement judge"] on a case-by-case basis
in his efforts to identify and/or negotiate
appropriate settlement values for individual
claims. When Judge Acosta determined that
the plaintiffs should try twelve
representative claims as a means of
facilitating settlement, a collaborative
composed of three PSC members and four IRPAs
bent their backs to the task.

Nineteen Appeals, 982 F.2d at 605. 

The combined efforts of all concerned generated a

settlement fund approximating $220,000,000. The district court

computed the payments due under the various contingent fee

agreements, deducted the total (roughly $68,000,000) from the

overall settlement proceeds, and placed that sum in an attorneys'

4

fee fund (the Fund).1 In his initial attempt to disburse the

Fund, Judge Acosta used an enhanced lodestar to compute the PSC's

fees, and awarded some $36,000,000 (52% of the Fund) to PSC

members in their capacity as such, leaving the balance to be

distributed among the IRPAs. A group of lawyers (mostly, but not

exclusively, "non-PSC" IRPAs)2 succeeded in vacating this award

on the ground that the proceedings were procedurally flawed. See 

id. at 610-16. 

The victory proved to be illusory. On remand, the

district court abandoned the lodestar approach, adopted the

percentage of the fund (POF) method, and recalculated the fees

based on what it termed "the relative significance of the labor

expended by the IRPAs and PSC members in instituting, advancing,

or augmenting the plaintiffs' settlement fund." Using this

 

1In addition to attorneys' fees, the lawyers are seeking
reimbursement of certain costs and expenses from the plaintiffs'
share of the settlement proceeds. The district court has yet to
make a final determination relative to costs, and we have not
considered that aspect of the matter. Thus, our opinion is
without prejudice to the parties' claims and objections in
respect to costs.

2Since each PSC member is also an IRPA in the sense that he
or she has been individually retained by one or more plaintiffs,
the PSC members will receive payments in both capacities.
Nevertheless, due to the wide disparity in the number of clients
that each PSC member represents, a generous PSC award stands to
benefit certain PSC members who have relatively few individual
clients and to disadvantage those who represent many claimants.
See Nineteen Appeals, 982 F.2d at 607. Similarly, an oversized 
PSC award is even more detrimental to the interests of those
IRPAs who are not members of the PSC, as each dollar that is paid
to the PSC shrinks the pot that otherwise will be divided among
the IRPAs. See id. Due to this phenomenon, some PSC members 
were among the lawyers who fought to overturn the original
allocation.

5

methodology, the court awarded 70% of the Fund to PSC members in

their capacity as such, thereby increasing their share of the 

fees by some $11,000,000, while simultaneously reducing the 

IRPAs' share of the Fund by the same amount. These appeals

ensued.

II. ADEQUACY OF THE PROCEEDINGS II. ADEQUACY OF THE PROCEEDINGS

In a virtual echo of the claims advanced in Nineteen 

Appeals, appellants (all of whom are IRPAs) characterize the 

proceedings by which the district court determined the allocation

of the Fund as unfair. Specifically, appellants assert that the

revamped procedural framework violated their rights to due

process, and that, in all events, the court abused its discretion

in erecting the framework. We consider these assertions in

sequence.

A. Due Process. A. Due Process. 

In Nineteen Appeals, 982 F.2d at 610-16, we discussed 

the due process considerations implicated in the fee-setting

aspect of this litigation. We again use the triangular construct

of Mathews v. Eldridge, 424 U.S. 319 (1976), to determine whether 

the district court afforded the IRPAs "the opportunity to be

heard `at a meaningful time and in a meaningful manner.'" Id. at 

333 (quoting Armstrong v. Manzo, 380 U.S. 545, 553 (1965)). 

The first Mathews factor involves a specification of 

"the private interest that will be affected by the official

action . . . ." Id. at 335. Rehashing this point would serve no 

useful purpose. We conclude, for precisely the same reasons

6

articulated in our earlier opinion, that the IRPAs have a salient

private interest in the fees due them for services rendered. See 

Nineteen Appeals, 982 F.2d at 612. 

The second Mathews factor requires us to examine the 

risk of error presented by the district court's procedures. See 

Mathews, 424 U.S. at 335. The last time around we determined 

that the hearing format invited error. See Nineteen Appeals, 982 

F.2d at 612-13. Appellants urge us to find that the proceedings

on remand represented no real improvement and again presented an

intolerable risk of error this time because the district court

refused to hold an evidentiary hearing, to allow free-form

discovery, or to permit cross-examination of PSC members. We

conclude, for reasons described more fully in Part II(B), infra, 

that the format revisions cured the infirmities that led us to

invalidate the district court's earlier effort.

The third Mathews factor necessitates an assessment of 

the public interest, including "the fiscal and administrative

burdens" that improved procedural requirements would entail.

Mathews, 424 U.S. at 335. Here, too, past is prologue: we 

studied this point in the course of the first appeal and remarked

the "substantial governmental interest in conserving scarce

judicial resources." Nineteen Appeals, 982 F.2d at 614. We also 

recognized the reasonableness of keeping tight controls on the

fee dispute in light of the large number of lawyers involved, the

lengthy shelf life of the litigation, and the Supreme Court's

admonition that "[a] request for attorney's fees should not

7

result in a second major litigation." Hensley v. Eckerhart, 461 

U.S. 424, 437 (1983). This important public interest remains

intact.

To sum up, the district court reformed its ways,

significantly moderating the restrictions originally imposed on

the IRPAs. The court levelled the playing field by permitting

the IRPAs to present their case in precisely the same manner as

their litigation adversaries. Moreover, the court gave both

camps adequate notice and a meaningful opportunity to be heard.

From a procedural standpoint, then, the adjudicative process

employed on remand met the test of fundamental fairness and gave

appellants the process that was due.

B. Abuse of Discretion. B. Abuse of Discretion. 

Appellants strive to convince us that Judge Acosta

abused his discretion in authoring three procedural rulings,

namely, (1) denying appellants' entreaty that an evidentiary

hearing be held; (2) denying the bulk of their discovery

requests; and (3) denying them the privilege of cross-

examination. We are not persuaded.

1. Lack of an Evidentiary Hearing. We need not tarry 1. Lack of an Evidentiary Hearing. 

over the supposed error in refusing to hold an evidentiary

hearing.3 A district court is not obliged to convene an
 

3The lower court did not make this decision casually. After
reminding the protagonists of his "detailed first hand knowledge
of the proceedings," Judge Acosta observed that "any meticulous
fact-finding regarding the contemporaneous time records of the
PSC is unnecessary because the lodestar method has been
abandoned; and both parties have been granted the opportunity to
file extensive pleadings describing their contributions to the

8

evidentiary hearing as a means of resolving every attorneys' fee

dispute. See Nineteen Appeals, 982 F.2d at 614; Weinberger v. 

Great N. Nekoosa Corp., 925 F.2d 518, 528 (1st Cir. 1991). 

Because evidentiary hearings in fee disputes are not mandatory,

the decision not to convene one is reviewed deferentially, using

an abuse-of-discretion standard. See Weinberger, 925 F.2d at 

527. In conducting that review, appellate tribunals cannot

woodenly apply a preconceived matrix. Rather, flexibility is the

watchword. Because a district court has available to it a "wide

range of procedures" through which it can "bring a sense of

fundamental fairness to the fee-determination hearing while at

the same time husbanding the court's resources," Nineteen 

Appeals, 982 F.2d at 614, flexibility implies substantial 

discretion. Therefore, when the court chooses among the

available options, it can mix and match.

This emphasis on flexibility is heightened when an

evidentiary hearing is requested. Even in situations far more

inviting than fee disputes, we have been chary about mandating

such hearings. See, e.g., Aoude v. Mobil Oil Corp., 862 F.2d 

890, 894 (1st Cir. 1988) (observing that matters often "can

adequately be `heard' on the papers"). We favor a "pragmatic

approach" to the question of whether, in a given situation, an

evidentiary hearing is required. Id. at 893. The key 

 

litigation process." He also stated that, "for the most part,"
the fee controversy presented "no material factual disputes
regarding the tasks undertaken by the PSC as contrasted to those
undertaken by the IRPAs."

9

determinant is whether, "given the nature and circumstances of

the case . . . the parties [had] a fair opportunity to present

relevant facts and arguments to the court, and to counter the

opponents' submissions." Id. at 894. Taking this approach in 

Aoude, we upheld the issuance of a preliminary injunction without 

an evidentiary hearing, noting, inter alia, that the judge was 

"obviously familiar" with the facts and had afforded the parties

several opportunities to make written submissions. Id. 

The Aoude model can readily be adapted to requests for 

hearings anent attorneys' fees. Appellants' protest cannot

survive the resultant comparison. Judge Acosta knew the case

inside and out. He gave the protagonists ample opportunity to

present both factual data and legal arguments. He set no page

restrictions on written submissions, permitting the IRPAs to

proffer thousands of pages of documents both in opposition to the

PSC's requisitions and in support of their own fee requests.4

These filings allowed the IRPAs to go into painstaking detail

both as to their own contribution to the litigation and as to the

reasons why the PSC members deserved a relatively modest slice of

 

4To give the reader a taste of what transpired, we note
that, on remand, the IRPAs' initial submission, filed June 10,
1993, included a memorandum of law regarding attorneys' fees and
expenses (110 pages, with a 40-page appendix), an affidavit by
the IRPAs' accountant, William Torres, detailing the results of
his analysis of the PSC's claims (approximately 650 pages), a
memorandum giving an overview of the efforts and contributions
made by the IRPAs (33 pages), and individual IRPA assessments of
efforts and contributions made on behalf of clients
(approximately 2700 pages). The IRPAs also filed a reply to the
PSC's main submission, again unhampered by page restrictions,
that totalled approximately 430 pages.

10

the pie for their services in that capacity.

To be sure, this is a high-stakes dispute, but that

fact, in and of itself, does not warrant handcuffing the trial

court. Matters of great consequence are often decided without

live testimony. See, e.g., id. at 893-94 (holding that an 

evidentiary hearing is not obligatory in respect to an

application for preliminary injunction); United States v. 

DeCologero, 821 F.2d 39, 44 (1st Cir. 1987) (same, regarding 

criminal defendant's motion to reduce his sentence); Amanullah v. 

Nelson, 811 F.2d 1, 16-17 (1st Cir. 1987) (same, regarding habeas 

review of asylum applicant's detention during exclusion

proceedings). In the last analysis, what counts is not the prize

at stake, but whether particular parties received "a

fundamentally fair chance to present [their] side of the story."

Nineteen Appeals, 982 F.2d at 611.  

The controlling legal principle, then, is that parties

to a fee dispute do not have the right to an evidentiary hearing

on demand. When the written record affords an adequate basis for

a reasoned determination of the fee dispute, the court in its

discretion may forgo an evidentiary hearing. Here, it is

pellucid that the litigants' extensive written submissions

comprised an effective substitute for such a hearing 

particularly since the judge had lived with the litigation from

the start and had an encyclopedic knowledge of it. Under these

circumstances, the court did not err in refusing to hold yet

another hearing. See, e.g., Norman v. Housing Auth., 836 F.2d 

11

1292, 1303 (11th Cir. 1988) (upholding propriety of awarding

attorneys' fees without an evidentiary hearing "based solely on

affidavits in the record"); Bailey v. Heckler, 777 F.2d 1167, 

1171 (6th Cir. 1985) (explaining that an evidentiary hearing is

not required so long as the record is sufficient to permit

meaningful review); National Ass'n of Concerned Veterans v. 

Secretary of Defense, 675 F.2d 1319, 1330 (D.C. Cir. 1982) 

(holding that district court may in its discretion decline to

convene a fee hearing where information generated by

"documentation accompanying the fee application and through

appropriate discovery . . . provides an adequate factual basis

for an award"); Konczak v. Tyrrell, 603 F.2d 13, 19 (7th Cir. 

1979) (indicating that "depth of the briefing" can render a

hearing on fees unnecessary), cert. denied, 444 U.S. 1016 (1980); 

see also 

DeJesus v. Banco Popular de P.R., 951 F.2d 3, 7 (1st Cir. 1992) 

(finding no error in lack of an evidentiary hearing regarding

counsel fees absent some "special issue as to which the court

needed the assistance of counsel or witnesses").

2. Restrictions on Discovery. Apart from the refusal 2. Restrictions on Discovery. 

to convene a full-scale hearing, appellants also complain that

the court demonstrated too great an aversion to discovery

initiatives. But unlimited adversarial discovery is not a

necessary or even a usual concomitant of fee disputes, see 

National Ass'n of Concerned Veterans, 675 F.2d at 1329 (noting 

that, in general, fee contests should not involve "the type of

12

searching discovery that is typical where issues on the merits

are presented"), and, in the circumstances of this case, we think

that the court acted well within the province of its discretion

in refusing to allow more elaborate discovery. 

The Due Process Clause does not require freewheeling

adversarial discovery as standard equipment in fee contests. See 

Nineteen Appeals, 982 F.2d at 614. This case exemplifies the 

wisdom of the rule. The district court did not shut off all

discovery, and the procedures that the court employed 

especially the compelled exchange of documentation minimized

the need for additional discovery by giving the IRPAs the raw

material that they needed to sift through the particulars of the

PSC's fee application. In other words, the court ensured that

the IRPAs had access to all the data reasonably necessary to

formulate their objections,5 including all the PSC members'

time-and-expense submissions, summaries thereof, detailed

accounts of the procedures used by the PSC to gather, review, and

audit time records, and the working papers, correspondence, and

documentation generated by the PSC's accountants during the

compilation process. With this banquet of information spread

before them, appellants then partook of the court's liberality in

allowing them to formulate extensive written submissions.

Furthermore, the court below also had a right to
 

5The proof of the pudding is in the record. The IRPAs'
initial submission to the district court highlighted specific
objections to the PSC's fee request, and, following the PSC's
rejoinder, the IRPAs' reply took precise aim at the accuracy of
the supporting materials.

13

consider the extent to which appellants' request for discovery

threatened to multiply the proceedings and turn the fee dispute

into a litigation of mammoth proportions. Judge Acosta

characterized the IRPAs' discovery foray which encompassed,

inter alia, production of tax returns for employees of all PSC 

members' firms and details anent fringe benefits (including

vacations, maternity leaves, and the provision of training

programs) as "a discovery scheme of needless and unreasonable

proportions." It is surpassingly difficult to fault this

characterization.

The sweeping nature of appellants' request, coupled

with the fact that the focus of the hearings had shifted away

from the lodestar and toward a task-oriented assessment of the

lawyers' participation in the litigation, give substance to the

district court's fears that granting appellants' supplication

would have started the parties on the road to a wasteful and

time-consuming "satellite litigation." On this ramified record,

appellants can demonstrate neither a high level of need for

incremental discovery nor preponderant equities in favor of their

request. Hence, we cannot say that the district court's denial

of further discovery constituted an abuse of the court's

considerable discretion. See, e.g., National Ass'n of Concerned 

Veterans, 675 F.2d at 1329 (holding that district court "retains 

substantial discretion based on its view of the submissions as a

whole" to limit further discovery).

3. Lack of Cross-Examination. As a subset of their 3. Lack of Cross-Examination. 

14

claims regarding the supposed necessity for both an evidentiary

hearing and additional discovery, appellants contend that the

district court should have allowed them to cross-examine the PSC

members concerning the hours that they logged and their

contribution to the creation of the Fund. This is merely a back-

door attempt to rekindle an extinguished flame and satisfy

appellants' thwarted desire for either an evidentiary hearing or

extensive depositions.

In Chongris v. Board of Appeals, 811 F.2d 36 (1st 

Cir.), cert. denied, 483 U.S. 1021 (1987), we held that, in the 

context of an administrative hearing, lack of cross-examination

did not work a violation of due process. See id. at 41-42. So 

it is here. Moreover, because the lower court could reasonably

conclude that its liberal policy with regard to written

submissions, in conjunction with the IRPAs' access to PSC

documentation, obviated the need for further probing via cross-

examination, pretermitting cross-questioning did not constitute

an abuse of discretion. Cf. Copeland v. Marshall, 641 F.2d 880, 

905 n.57 (D.C. Cir. 1980) (en banc) (noting that a live hearing

is not necessary if "the adversary papers filed by plaintiff and

defendant . . . adequately illuminate the factual predicate for a

reasonable fee").

Appellants' attempt to anchor their claimed right to

cross-question PSC members on language excerpted from our earlier

opinion, see, e.g., Nineteen Appeals, 982 F.2d at 615, leaves 

them adrift. We flatly reject the suggestion, noting that

15

appellants, to their discredit, have pieced the argument together

by cutting words loose from their logical and contextual

moorings, and ignoring limiting language that contradicts their

interpretation.

The bottom line is that the district court did not err

in refusing to convene an evidentiary hearing, declining to

permit more wide-ranging discovery, and barring cross-

examination. Thus, whether the issue is cast in a constitutional

mold or considered under an abuse-of-discretion rubric,

appellants' challenge fails. Either way, the adjudicative

process employed on remand passes muster. 

III. APPROPRIATENESS OF THE METHODOLOGY III. APPROPRIATENESS OF THE METHODOLOGY

Appellants claim that the district court erred as a

matter of law in embracing the POF method, rather than the

lodestar method, during the fee-setting pavane. The issue of

whether a district court may use a given methodology in

structuring an award of attorneys' fees is one of law, and, thus,

is subject to de novo review. See Liberty Mut. Ins. Co. v. 

Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992). 

A. Historical Perspective. A. Historical Perspective. 

A few introductory comments may lend a sense of

perspective. Traditionally, under what has come to be known as

the "American Rule," litigants bear their own counsel fees. See 

Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 245 

(1975). This rule is not without exceptions. Fee-shifting

statutes comprise one category of exceptions. See, e.g., 42 

16

U.S.C. 1988, 2000e-5(k). So, too, certain equitable doctrines

furnish a basis for departing from the American Rule. See 

Nineteen Appeals, 982 F.2d at 606. 

When statutory exceptions pertain, we have directed

district courts, for the most part, to compute fees by using the

time-and-rate-based lodestar method. See, e.g., United States v. 

Metropolitan Dist. Comm'n, 847 F.2d 12, 15 (1st Cir. 1988); Segal 

v. Gilbert Color Sys., Inc., 746 F.2d 78, 85-86 (1st Cir. 1984); 

see also City of Burlington v. Dague, 112 S. Ct. 2638, 2641 

(1992) (acknowledging, in the statutory fee-shifting context, "a

strong presumption that the lodestar represents the reasonable

fee") (citation and internal quotation marks omitted). A court

arrives at the lodestar by determining the number of hours

productively spent on the litigation and multiplying those hours

by reasonable hourly rates. See Blum v. Stenson, 465 U.S. 886, 

896-902 (1984); Hensley, 461 U.S. at 433; Lipsett v. Blanco, 975 

F.2d 934, 937 (1st Cir. 1992).

Although the lodestar method is entrenched in the

statutory fee-shifting context, a growing number of courts have

looked elsewhere in "common fund" cases a category that

encompasses cases in which "a litigant or lawyer who recovers a

common fund for the benefit of persons other than himself or his

client is entitled to a reasonable attorney's fee from the fund

as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 

17

(1980).6 The POF method represents one such alternative

approach to fee-setting. This method functions exactly as the

name implies: the court shapes the counsel fee based on what it

determines is a reasonable percentage of the fund recovered for

those benefitted by the litigation. See, e.g., Camden I Condo. 

Ass'n, Inc. v. Dunkle, 946 F.2d 768, 771 (11th Cir. 1991). 

Contrary to popular belief, it is the lodestar method,

not the POF method, that breaks from precedent. Traditionally,

counsel fees in common fund cases were computed as a percentage

of the fund, subject, of course, to considerations of

reasonableness. See, e.g., Central R.R. & Banking Co. v. Pettus, 

113 U.S. 116, 127-28 (1885). It was not until the mid-1970s that

judicial infatuation with the lodestar method started to spread.

See Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1266 (D.C. Cir. 

1993) (chronicling history of the debate). Many courts embraced

the new approach, and a wall of cases soon arose. See, e.g., 

Copeland, 641 F.2d at 890-91; Furtado v. Bishop, 635 F.2d 915, 

919-20 (1st Cir. 1980); City of Detroit v. Grinnell Corp., 560 

F.2d 1093, 1098 (2d Cir. 1977); Grunin v. International House of 

Pancakes, 513 F.2d 114, 128 (8th Cir.), cert. denied, 423 U.S. 

864 (1975); Lindy Bros. Builders, Inc. v. American Radiator & 

 

6The common fund doctrine is founded on the equitable
principle that those who have profited from litigation should
share its costs. While class actions furnish the most fertile
ground for the doctrine, its reach is not limited to such cases.
See Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 167 (1939) 
(holding that "the absence of an avowed class suit . . . hardly
touch[es] the power of equity in doing justice as between a party
and the beneficiaries of his litigation").

18

Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973). 

A crack in the wall appeared in 1984 when the Supreme

Court took pains to distinguish the calculation of counsel fees

under fee-shifting statutes from the calculation of counsel fees

under the common fund doctrine. The court described the latter

group as comprising cases in which "a reasonable fee is based on

a percentage of the fund bestowed on the class." Blum, 465 U.S. 

at 900 n.16. Since Blum involved the application of the lodestar 

under a fee-shifting statute, footnote 16 is dictum. Yet, it can

hardly be dismissed as a slip of the pen, and considered dictum

emanating from the High Court carries great persuasive force.7

See Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 

453, 459 (1st Cir. 1992) (stating general rule that courts should

give "considerable weight" to dictum that appears "considered as

opposed to casual"); McCoy v. Massachusetts Inst. of Technology, 

950 F.2d 13, 19 (1st Cir. 1991) (same), cert. denied, 112 S. Ct. 

1939 (1992).

Hard on the heels of footnote 16, the Third Circuit,

which had been in the forefront of the movement toward the

lodestar method, see, e.g., Lindy Bros., supra, sounded a note of 

caution. Its blue-ribbon task force, although recommending

continued use of the lodestar technique in statutory fee-shifting

 

7For this reason, we find it unsurprising that other courts
have cited footnote 16 as evidence that the Blum Court's 
"approval of the lodestar method in the fee-shifting context was
not intended to overrule prior common fund cases. . . ." Swedish 
Hosp., 1 F.3d at 1268; see also Brown v. Phillips Petroleum Co., 
838 F.2d 451, 454 (10th Cir.), cert. denied, 488 U.S. 822 (1988). 

19

cases, concluded that all fee awards in common fund cases should

be structured as a percentage of the fund. See Report of the 

Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 

237, 255 (1985) (hereinafter "Third Circuit Report").

Together, footnote 16 and the Third Circuit Report led

to a thoroughgoing reexamination of the suitability of using the

lodestar method in common fund cases. This reexamination, in

turn, led to more frequent application of the POF method in such

cases. See Federal Judicial Center, Awarding Attorneys' Fees and 

Managing Fee Litigation 63-64 (1994) (hereinafter "FJC Report") 

(canvassing case law). Today, the D.C. Circuit and the Eleventh

Circuit require the use of the POF method in common fund cases,

see Swedish Hosp., 1 F.3d at 1271; Camden I, 946 F.2d at 774, and 

four other circuits confer discretion upon the district court to

choose between the lodestar and POF methods in common fund cases,

see In re Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 

1291, 1295 (9th Cir. 1994); Rawlings v. Prudential-Bache Props., 

Inc., 9 F.3d 513, 516 (6th Cir. 1993); Harman v. Lymphomed, Inc., 

945 F.2d 969, 975 (7th Cir. 1991); Brown v. Phillips Petroleum 

Co., 838 F.2d 451, 454 (10th Cir.), cert. denied, 488 U.S. 822 

(1988). We have yet to pass upon the legitimacy of the POF

method in common fund cases.8
 

8Of course, we alluded to the trend in Weinberger, stating: 

We are aware of the tendency exhibited by
some courts, particularly in common fund
cases, to jettison the lodestar in favor of a
`reasonable percent of the fund' approach.
Because the absence of any true common fund

20

B. Computing Fees in Common Fund Cases. B. Computing Fees in Common Fund Cases. 

We have previously classified this as a common fund

case.9 Appellants do not dispute this taxonomy, but, rather,

they insist that Judge Acosta erred in using the POF method

because the lodestar technique should hold sway in all attorneys' 

fee determinations.10 Though appellants concede that this
 

renders the percentage approach inapposite
here, we cannot fault the district court's
implied premise that the lodestar is the
soundest available alternative.

Weinberger, 925 F.2d at 526 n.10 (citations omitted). This 
statement has been interpreted as conferring discretion upon
district courts to use the POF method in common fund cases, see, 
e.g., Wells v. Dartmouth Bancorp, Inc., 813 F. Supp. 126, 129 
(D.N.H. 1993), and, in some quarters, as indicating a preference
for the use of that method, see, e.g., FJC Report, supra, at 64 & 
n.305.

9We reached this conclusion because the Fund emanates from
"the disproportionate strivings of a few (the PSC members) to the
benefit of a much larger number (the plaintiffs and,
derivatively, the IRPAs)," Nineteen Appeals, 982 F.2d at 610, and 
possesses each of the three distinguishing characteristics
identified by the Boeing Court: 

First, the . . . beneficiaries can be
determined with complete assurance. Second,
while the extent to which each individual
plaintiff and each IRPA benefitted from the
PSC's efforts cannot be quantified with
mathematical precision, it is possible to
study the PSC's contribution to the overall
success of the litigation and approximate the
incremental benefits with some accuracy.
Finally, the district court controls [the
Fund], and, therefore, possesses the ready
ability to prorate the cost of achieving the
incremental benefits in an equitable manner.

Id. (citing Boeing, 444 U.S. at 478-79). 

10In a sermon that is difficult to reconcile with this
display of newfound religion, appellants preach intermittently
that Judge Acosta's initial suggestion that the PSC's fees

21

court has not yet decided what method(s) of fee allocation

appropriately may be invoked in common fund cases, they assert

that the lodestar is a far better alternative and that its use

should be mandated in this circuit.

We think that a more malleable approach is indicated.

Thus, we hold that in a common fund case the district court, in

the exercise of its informed discretion, may calculate counsel

fees either on a percentage of the fund basis or by fashioning a

lodestar. Our decision is driven both by our recognition that

use of the POF method in common fund cases is the prevailing

praxis and by the distinct advantages that the POF method can

bring to bear in such cases.

In complex litigation and common fund cases, by and

large, tend to be complex the POF approach is often less

burdensome to administer than the lodestar method. See Swedish 

Hosp., 1 F.3d at 1269 (finding POF approach "less demanding of 

scarce judicial resources"). Rather than forcing the judge to

review the time records of a multitude of attorneys in order to

determine the necessity and reasonableness of every hour

expended, the POF method permits the judge to focus on "a showing

that the fund conferring a benefit on the class resulted from"

the lawyers' efforts. Camden I, 946 F.2d at 774. While the time 

 

would probably be computed using the POF method and would
probably aggregate "less than 10%" should be enshrined and
enforced by us. We have already ruled that this suggestion "did
not bind the district court to a ten percent cap," Nineteen 
Appeals, 982 F.2d at 612, and appellants have proffered nothing 
that prompts us to revisit this ruling.

22

logged is still relevant to the court's inquiry even under the

POF method, time records tend to illuminate the attorneys' role

in the creation of the fund, and, thus, inform the court's

inquiry into the reasonableness of a particular percentage11 

the shift in focus lessens the possibility of collateral disputes

that might transform the fee proceeding into a second major

litigation.

For another thing, using the POF method in a common

fund case enhances efficiency, or, put in the reverse, using the

lodestar method in such a case encourages inefficiency. Under

the latter approach, attorneys not only have a monetary incentive

to spend as many hours as possible (and bill for them) but also

face a strong disincentive to early settlement. See Third 

Circuit Report, 108 F.R.D. at 247-48 (finding that, in common

fund cases, the lodestar method "encourag[es] lawyers to expend

excessive hours" and "creates a disincentive for the early

settlement of cases"); see also FJC Report, supra, at 310. If 

the POF method is utilized, a lawyer is still free to be

inefficient or to drag her feet in pursuing settlement options 

but, rather than being rewarded for this unproductive behavior,

she will likely reduce her own return on hours expended.

Another point is worth making: because the POF

technique is result-oriented rather than process-oriented, it

 

11For this reason, and because the district court in any
given case may eschew the POF method in favor of the lodestar
method, we urge attorneys to keep detailed, contemporaneous time
records in common fund cases.

23

better approximates the workings of the marketplace. We think

that Judge Posner captured the essence of this point when he

wrote that "the market in fact pays not for the individual hours

but for the ensemble of services rendered in a case of this

character." In re Continental Ill. Sec. Litig., 962 F.2d 566, 

572 (7th Cir. 1992). In fine, the market pays for the result

achieved.

Let us be perfectly clear. We do not pretend that the

POF approach is foolproof, or that it suffers from no

disadvantages. For example, it may result in the

overcompensation of lawyers in situations where actions are

resolved before counsel has invested significant time or

resources. See Six Mexican Workers v. Arizona Citrus Growers, 

904 F.2d 1301, 1311 (9th Cir. 1990) (counselling use of the

lodestar method rather than the POF method when "the percentage

recovery would be either too small or too large in light of the

hours devoted to the case or other relevant factors"); see also 

Third Circuit Report, 108 F.R.D. at 242 (noting "criticism from

within the profession" that fees under the POF method sometimes

are "disproportionate to actual efforts expended by the

attorneys"). The converse is also true; law firms may be less

willing to commit needed resources to common fund cases, even

those for the public benefit, if the likely recovery is

relatively small. It can also be argued that the percentage

method may lend itself to arbitrary fee awards by some courts.

See generally Washington Pub. Power, 19 F.3d at 1294 n.2 

24

(counselling that, to avoid arbitrary fee awards, neither the POF

nor the lodestar method "should be applied in a formulaic or

mechanical fashion"); cf. Laffey v. Northwest Airlines Inc., 746 

F.2d 4, 12-13 (D.C. Cir. 1984) (attributing widespread adoption

of lodestar method to desire to reduce "arbitrariness

characteristic of court awards of attorneys fees" under other

methods), cert. denied, 472 U.S. 1021 (1985). Given the 

peculiarities of common fund cases and the fact that each method,

in its own way, offers particular advantages, we believe the

approach of choice is to accord the district court discretion to

use whichever method, POF or lodestar, best fits the individual

case. We so hold, recognizing that the discretion we have

described may, at times, involve using a combination of both

methods when appropriate. Cf. Metropolitan Dist. Comm'n, 847 

F.2d at 15 (advocating flexible approach to determining fee

awards because an overly mechanical rule "sacrifice[s] substance

on the altar of form").

In arriving at this decision, we reject appellants'

suggestion that Dague, a case in which the Court barred the use 

of contingency enhancements in respect to fee-shifting statutes,

compels a different conclusion. Although the Dague Court stated 

that "[t]he `lodestar' figure has, as its name suggests, become

the guiding light of our fee-shifting jurisprudence," 112 S. Ct.

at 2641, and remarked that it had "generally" abjured "the

contingent-fee model which would make the fee award a

percentage of the value of the relief awarded in the primary

25

action [in favor of] the lodestar model," id. at 2643 

(citations, footnotes, and internal quotations omitted), these

statements were made in the course of a discussion of statutory

fee-shifting cases. The Court's reasoning reflected this

environment; the opinion stressed the limiting effects of

statutory language in fee-shifting cases, see id., and set out "a 

number of reasons for concluding that no contingency enhancement

is compatible with the fee shifting statutes at issue," id. This 

case, unlike Dague, involves a common fund rather than a 

statutory fee-shifting scheme. Since Dague, fairly read, does 

not require abandonment of the POF method typically used in

common fund cases, it is not controlling here. Accord Swedish 

Hosp., 1 F.3d at 1267-70 (concluding that Dague does not bar use 

of the POF method in common fund cases).

C. Applying the Rule. C. Applying the Rule. 

Having placed our imprimatur on a decisional model that

maximizes flexibility, we move from the general to the specific

and turn next to the order under review. In this connection, we

rule that the court below did not err in purposing to allocate

fees based on the POF method, emphasizing the attorneys'

"relative contribution" to the creation of the Fund. In the

first place, Judge Acosta had originally stated an intent to

compensate the PSC members under a percentage approach. See 

supra note 10. In "justifiable reliance" on this statement, see 

Nineteen Appeals, 982 F.2d at 614 n.19, the majority of the IRPAs 

did not maintain time records. The difficulties inherent in

26

implementing the lodestar under these circumstances militate in

favor of sticking to the POF method. In the second place, as we

have explained above, the POF approach offers significant

structural advantages in common fund cases, including ease of

administration, efficiency, and a close approximation of the

marketplace. Finally, a further case-specific factor counsels

against using the lodestar here. Unlike the prototypical common

fund case, this case involves a subdivision of a fee fund amassed 

by the operation of sundry contractually determined percentages.

Thus, using the POF method to effectuate the subdivision of the

Fund brings a sort of elemental symmetry to the fee-setting

process. Relatedly, because this case calls for a subdivision of

a fee fund, rather than a unitary award of fees, "a trier who

attempted punctiliously to follow the classic lodestar formula,

to the exclusion of all else, could theoretically wind up

awarding the entire fee pool to the PSC, leaving nothing for the

IRPAs." Id. at 614 n.20. Use of the POF method negates any 

possibility of this totally indefensible result.

IV. APPROPRIATENESS OF THE ALLOCATION IV. APPROPRIATENESS OF THE ALLOCATION

In allocating counsel fees, the district court assigned

70% of the Fund to the PSC, leaving 30% to be split among the

IRPAs.12 Appellants object. We review this allocation for

abuse of discretion, see, e.g., Foley v. City of Lowell, 948 F.2d 

10, 18 (1st Cir. 1991), mindful that, in respect to fee awards,

 

12The PSC members will, of course, share ratably in the
latter portion of the award as well. See supra note 2. 

27

the trial court's latitude is "extremely broad," Lipsett, 975 

F.2d at 937. After scrutinizing the Brobdingnagian record in

this case, we are convinced that the court below erred in

weighing and synthesizing the factors relevant to a division of

the fees, and in settling upon so lopsided a split.

A. Cutting the Pie. A. Cutting the Pie. 

In the proceedings on remand, Judge Acosta lavished

praise on all the plaintiffs' lawyers, lauding the "high caliber

legal representation" provided by both the PSC and the IRPAs. He

then summarized the tasks undertaken by the two sets of attorneys

in the course of the litigation. In the judge's view, the PSC's

most significant accomplishments included (1) performing a

comprehensive on-site investigation of the accident scene, (2)

"identif[ying] the manufacturers and suppliers of many . . .

products and services . . . and develop[ing] theories of

liability against each opponent," (3) drafting plethoric

pleadings, including the master complaint, weekly agendas, and

several pretrial memoranda, (4) filing "literally hundreds of

motions . . . on numerous topics, including many novel and

creative issues," (5) orchestrating extensive pretrial discovery,

(6) conducting the nine-week Phase I trial and the fifteen-month

Phase II trial (in the course of which the PSC called 313

witnesses and offered 1,455 exhibits), and (7) "aggressively

pursu[ing] settlement negotiations." The court visualized the

IRPAs' main accomplishments as comprising (1) maintaining direct

client communication, counselling clients, and keeping them

28

abreast of developments in the litigation, (2) carrying out the

factual investigation incident to individual cases, with especial

emphasis on issues pertaining to damages, (3) retaining experts,

including physicians, economists, and actuaries, and, once the

experts had been located, collaborating with them to establish

damages, (4) researching client-specific legal issues (e.g., 

standing, assumption of risk), (5) representing individual

plaintiffs in connection with ancillary matters, including

probate, inheritance, insurance, and domestic relations matters,

(6) meeting with Judge Bechtle "as part of the settlement scheme

to negotiate settlement values for [individual] cases," and (7)

assisting clients in reaching informed decisions (including

decisions about whether to accept or reject proffered

settlements). Moreover, certain selected plaintiffs were used as

exemplars for purposes of the Phase II trial, and the IRPAs who

represented those plaintiffs actually presented the evidence

pertaining to their clients' damages.

Having made these ledger entries, the district court

then tabulated the columns. It concluded that "reasonable

compensation for the work undertaken requires recognition of the

massive undertaking of the PSC in terms of the organizational and

financial requirements, the overwhelming amount of work

performed, the significant time constraints, and the numerous

complex and novel issues addressed during the proceedings . . .

." Contrasting this workload "with the IRPAs' efforts in client

communication and counseling, client preparation for settlement,

29

and handling of the damages issues," the court awarded the PSC

70% of the fee due under each individual contingency agreement,

thus permitting each IRPA to retain only 30% of the fee promised

by the client.

B. Evaluating the Court's Handiwork. B. Evaluating the Court's Handiwork. 

We are uneasy with the way in which the lower court cut

the fee pie, and with the size and shape of the resultant wedges,

for several reasons.

First, we are troubled by the implications of a scheme

in which the trial judge selects a chosen few from many lawyers

who volunteer, assigns legal tasks to those few (thereby

dictating, albeit indirectly, the scope of the work remaining to

be done by the many), and then, in awarding fees, heavily

penalizes the very lawyers to whom he has relegated the "lesser"

duties. Courts must recognize that while such an arrangement may

be a necessary concomitant to skillful case management of mass

tort suits, it nevertheless significantly interferes with an

attorney's expectations regarding the fees that his or her client

has agreed to pay. Conversely, lead counsel are typically

volunteers, as in this case, and, as such, they have no right to

harbor any expectation beyond a fair day's pay for a fair day's

work if a fee fund develops. Cf. Matthew 20:1-16 (recounting 

parable of the laborers in the vineyard). We believe that trial

courts should take these differing expectations into account in

allocating fees. Here, the judge's rescript does not suggest

that he factored these expectations into the decisional calculus.

30

Courts must also be sensitive to a second facet of

economic reality: the power to appoint lead counsel gives the

trial judge an unusual degree of control over the livelihood of

the lawyers who practice before the court. Though such

appointments are often an administrative necessity in complex

litigation, and disproportionate fees are at times an unavoidable

consequence of the classic common fund "free rider" problem, see 

generally Mancur Olson, Jr., The Logic of Collective Action 

(1971), the judge must attempt to avoid any perception of

favoritism. This need is especially acute in mass tort

litigation where, as this case illustrates, free rider concerns

are minimized by the important nature of the work to be done by

claimants' individually retained attorneys. In this case,

moreover, free rider concerns are also lessened by the fact that

most of the IRPAs applied for appointment to the PSC, see 

Nineteen Appeals, 982 F.2d at 605 (noting that over 40 of the 56 

IRPAs volunteered to serve on the PSC), thus signifying their

willingness to pay full fare. The record does not contain any

clue intimating that Judge Acosta considered these factors in

ordering that 70% of the fees be paid to the PSC.

Third, and relatedly, this case required the IRPAs not

merely to go along for a free ride but to earn their keep. They

exhibited great versatility, counseling clients, researching

medical histories, arranging for specialists to evaluate

injuries, preparing the damages aspect of each case (including

extensive work with physicians, psychologists, actuaries,

31

vocational specialists, and other witnesses), obtaining evidence

needed to prove losses of earnings and earning capacity,

responding to client-specific discovery, preparing for and

attending clients' depositions, negotiating settlement values

before Judge Bechtle, assisting clients with probate, insurance,

and tax matters, and handling a bewildering array of

idiosyncratic problems as they developed. This is a far cry from

the paradigmatic common fund case say, a securities class

action in which class counsel do virtually all the work, and

other counsel piggyback on their efforts. See, e.g., In re Ivan 

F. Boesky Sec. Litig., 948 F.2d 1358, 1364-65 (2d Cir. 1991); see 

also Randall S. Thomas & Robert G. Hansen, Auctioning Class 

Action and Derivative Lawsuits: A Critical Analysis, 87 Nw. U. 

L. Rev. 423, 429 (1993) (explaining that, in general, lead

counsel in class actions have "substantial authority to conduct

the litigation, even to the exclusion of other counsel");

Jonathan R. Macey & Geoffrey P. Miller, The Plaintiffs' 

Attorney's Role in Class Action and Derivative Litigation: 

Economic Analysis and Recommendations for Reform, 58 U. Chi. L. 

Rev. 1, 3 (1991) (observing that plaintiffs' class action

attorneys have "nearly plenary control over all important

decisions in the lawsuit" because of the absence of monitoring by

clients). We see no sign that the district court gave

significant weight to this reality.

This leads directly to a fourth point. We have

carefully considered the IRPAs' compendious submissions and are

32

of the view that Judge Acosta undervalued the worth of the client

contact/counseling aspect of this litigation. Such services are

labor-intensive and frequently low in visibility at least in

visibility from the bench. Thus, they are susceptible to being

overlooked, leading to an overemphasis on the relative value of

the court-related work. Despite their lack of visibility,

however, the mundane chores incident to client representation are

particularly critical in a mass tort common fund case. We

explain briefly.

In a securities class action many of the victims do not

participate in the lawsuit, and are aware of their loss dimly, if

at all. See, e.g., Macey & Miller, supra, at 30 (noting that 

"[i]n the large-scale, small-claim class action context . . .

[plaintiffs] are typically unaware that they even have a claim

against the defendant"). The mass tort context supplies a

stunning contrast. In a mass tort action, the victims' losses

(whether of life, limb, or loved ones) are almost always keenly

felt, and are usually not amenable to computation by a simple

arithmetic formula. As a result, the individual plaintiffs

typically require a multitude of services, many of which cannot

be satisfied by an impersonal steering committee. In such

circumstances, the attention of the individually retained

attorneys becomes crucial to the success of the overall

enterprise.13 That important contribution demands appropriate
 

13One IRPA, now deceased, made this point in a submission to
the district court:

33

recognition.

Fifth, although we do not dispute the district court's

assessment of the quality of the PSC's work, this factor cancels

itself out to some extent. After all, the district court

repeatedly commented upon "the excellence of the work performed

by all attorneys" (emphasis supplied), and left no doubt but that 

both sets of plaintiffs' lawyers had rendered exemplary service.

Given these widespread plaudits, it seems manifestly unfair to

reward excellence on the part of one group and not the other.

Sixth, the district court failed to advance any

reasoned explanation as to why it boosted the PSC's share of the

Fund from 52% in the initial go-round to 70% on remand.14
 

In the course of representing these clients,
the attorneys and staff did hundreds of hours
of work that was not separately billed but
that is a part of the work of competent and
dedicated [IRPAs]. For example we helped to
arrange the shipping of bodies from Puerto
Rico to their homes, counseled families . . .
to help them function as witnesses, obtained
[hard to locate] records, investigated
possible criminal activity, searched for
heirs, negotiated with creditors, and with
law enforcement agencies, and researched
legal issues such as the rights to awards
from the State insurance fund.

14This discrepancy cannot be brushed aside with the glib
reminder that, on remand, the district court abandoned the
lodestar in favor of the POF method. The court had originally
arrived at the 52% figure through an enhancement of the lodestar
to account for "the extraordinary results" achieved by the PSC.
In re San Juan Dupont Plaza Hotel Fire Litig., 768 F. Supp. 912, 
932 (D.P.R. 1991). Thus, the court premised the original award,
in large measure, on its assessment of the role that the PSC
played in creating the Fund.

34

Though we have great confidence in Judge Acosta, his silence on

this subject leaves the award open to a perception that

appellants have been penalized for successfully prosecuting their

previous appeals. Cf. North Carolina v. Pearce, 395 U.S. 711 

(1969) (discussing importance of dispelling any appearance of

vindictiveness when a judge imposes a more severe sentence upon a

criminal defendant after the defendant wins a new trial).

Seventh, the district court erred in failing to

compensate the representative trial counsel those IRPAs who,

though not members of the PSC, prepared and/or tried the so-

called "representative" cases for their work in that capacity.

Just as the PSC members deserved compensation for their endeavors

on behalf of the whole, the IRPAs who labored as representative

counsel conferred a common benefit, and must be compensated

accordingly.

Last but far from least we are persuaded, on whole-

record review, that it is simply unreasonable to award 70% of the

aggregate fees to the attorneys who managed the litigation,

leaving only 30% of the Fund to those who brought in the clients

and worked hand-in-hand with them throughout the pendency of this

long safari of a case. Because mass tort cases are a breed

apart, it is difficult to envision situations in which, if fees

are divided between lead counsel and individually retained

counsel under a POF formula, the latter will not be entitled to

35

at least half the fees.15 We do not think that this

litigation, though unique, so far overshoots all other cases as

to warrant a substantially larger differential. See, e.g., 

Vincent v. Hughes Air W., Inc., 557 F.2d 759 (9th Cir. 1977) 

(upholding district court's allocation of 5% of gross recovery,

or approximately 20% of the fee fund, to lead counsel in mass

tort action).

Concluding, as we do, that the fee allocation reflects

a serious error of judgment, and therefore an abuse of

discretion, we vacate the award.

V. REMEDY V. REMEDY

Ordinarily, "an improper calculation of attorneys' fees

necessitates remand for reconfiguration of the award." Lipsett, 

975 F.2d at 943. But this rule admits of exceptions, so long as

"the record is sufficiently developed that we can apply the law

to the facts before us and calculate a fair and reasonable fee

without resorting to remand." Id. Here, that qualification is 

satisfied; the record is voluminous and this court is painfully

familiar with the particulars of this fee imbroglio.

Nonetheless, an appellate court must think long and hard before

usurping the district court's usual prerogatives, and, therefore,

we doubt that this case would fall within the narrow confines of

the exception under ordinary circumstances. But the

circumstances here are extraordinary, and common sense commands
 

15We have been unable to find any common fund case in which 
a court, using the POF method, has allocated more than 50% of a
fee fund to lead counsel.

36

that we not turn a blind eye to the reality of events.

This litigation has passed the point of diminishing

returns. The holocaust that underlies the plaintiffs' claims

occurred almost a decade ago. The meat-and-potatoes litigation

is over; with one small exception, see supra note 1, only a side 

dish attorneys' fees remains on the table. The amount of

time, energy and money already devoted to this peripheral item

has careened virtually out of control. Remanding would invite an

even greater investment in the side dish and we are reluctant

to sanction the squandering of additional resources for this

purpose. We have, at times, with considerably less provocation,

simply grasped the bull by the horns and fixed the fees

ourselves. See, e.g., Jacobs v. Mancuso, 825 F.2d 559, 562 (1st 

Cir. 1987); Grendel's Den v. Larkin, 749 F.2d 945, 951 (1st Cir. 

1984).

We realize that dividing the Fund among groups of

attorneys in accordance with the POF method cannot be

accomplished with surgical precision. We or a district court,

for that matter must necessarily traffic in estimates. Taking

into account all the facts and circumstances, we conclude that we

should subdivide the Fund ourselves, rather than remand yet

again. We also conclude that, on balance, assigning 50% of the

Fund to the PSC and 50% to the IRPAs comprises a fair and

reasonable allocation.

This division reflects the district court's

determination that the PSC contributed handsomely to the creation

37

of the Fund it is, after all, at the high end of what a court

should usually award16 while at the same time correcting for

the district court's undervaluation of the IRPAs' contributions.

This division also strikes a sensible balance between the equity-

based common fund doctrine, which guards against the unjust

enrichment of free riders, and the need to avoid adding insult to

injury in a situation in which the court selects lead counsel

from amidst a group of willing volunteers and thereafter invades

the contingency agreements of the rejected lawyers to compensate

the select few. Moreover, this division is not incommensurate

with the time records of the PSC. Even if, as an uncritical

reading of the record suggests, the PSC spent as many as 166,000

hours on the litigation,17 a 50% allocation (roughly

$34,000,000) pays the members well. Although we have no

tabulation of IRPA hours to compare with this total, the PSC's

time records are still a valid measure of the vast resources its

members expended in the course of the litigation.

One loose end remains. It involves appropriate

compensation for the IRPAs who tried the "representative" cases.

As we stated earlier, see supra p.33, their participation in the 

 

16Although we do not impose an absolute ceiling on lead
counsel fees in common fund mass tort cases, cf. Camden I, 946 
F.2d at 774-75 (holding that, as a general rule, 50% is the upper
limit in common fund cases in the Eleventh Circuit), cases in
which a court should exceed 50% are likely to be hen's-teeth
rare.

17This figure includes time logged not only by the PSC
members themselves but also by their associates, paralegals, and
law clerks.

38

Phase II trial inured to the benefit of all plaintiffs. Thus, in

presenting the representative claims, the lawyers were acting as

de facto PSC members. It is only logical, therefore, that their 

compensation for those services be drawn from the PSC's share of

the fee Fund. Since the record is inadequate to permit us to

place a dollar value on these services, we leave it to the

district court to determine the amount of compensation due to the

non-PSC members who served as representative trial counsel during

the Phase II trial for their services in that capacity, and then

to order that sum paid out of the PSC's share of the Fund.

VI. CONCLUSION VI. CONCLUSION

We need go no further. For the reasons we have

expressed, we vacate the order allocating attorneys' fees; direct

that the fee Fund be divided equally among the PSC, on the one

hand, and the IRPAS, on the other hand; and remand for the entry

of a suitable decree and for further proceedings consistent with

this opinion. Costs shall be taxed in favor of the appellants.

It is so ordered. It is so ordered. 

39