The CADLE COMPANY, Appellant

v.

James J. McKERNAN, Jr., Appellee.

In re James J. McKernan, Jr., Debtor.

The CADLE COMPANY, Plaintiff,

v.

James J. McKERNAN, Jr., Defendant.

Civil Action No. 96–10006–REK.
Bankruptcy No. 93–10347–JNF.
Adversary No. 93–2061.

United States District Court,
D. Massachusetts.

April 28, 1997.

John A. Doonan, Doonan & Graves, Salem, MA, for Cadle Co.

Giles A. Birch, Goodwin, Procter & Hoar, Boston, MA, for James J. McKernan.

## OPINION

KEETON, District Judge.

This appeal is from two Orders of the Bankruptcy Court. Appellant's reference to a third Order, of February 1995, is surplusage; the Bankruptcy Court vacated the February Order when making its Order of April 21, 1995. Memorandum of April 21, 1995, at page 6.

## I.

The first Order appealed from, made on April 21, 1995,

(a) dismissed "count two of the Cadle Company's two count Amended Complaint," and

(b) ordered "summary judgment in favor of the Debtor and against the Cadle Company with respect to count one."

The Order also scheduled a pretrial hearing with respect to the counterclaims that had been filed by the debtor against Cadle Company.

In count one Cadle, as successor-in-interest to the Federal Deposit Insurance Corporation (FDIC) and current owner of loan documents executed by the Debtor, alleged that the Debtor executed an Assignment of Rent with respect to an Augustus Street property and that in view of a prior Assignment of Rent to ComFed in 1988 "this statement" (apparently referring to the Assignment of Rent between the Debtor and Cadle) was false and constituted "the obtaining of money by false pretenses, false representation, or factual fraud" in violation of 11 U.S.C. § 523(a)(2)(A). Cadle also alleged that Cadle, as successor to FDIC, was entitled to rely on the bank records as they existed at the time FDIC was appointed receiver for the failed Boston Trade Bank.

 In count two, Cadle alleged that the Debtor was entitled to collect rents "only so long as there was no default under the loan documents," that the Debtor defaulted and continued to collect rents, and that such conduct constituted an intentional and deliberate conversion of property in which Cadle had a security interest, in knowing disregard of Cadle's rights and in violation of 11 U.S.C. § 523(a)(6).

The Bankruptcy Court's dismissal of count two was grounded on inadequacy of Cadle's original complaint "to put the Debtor on notice that Cadle contemplated an action for the alleged conversion of rents in which it claims a security interest." This part of the Order must be vacated in view of precedents counseling against dispositive rulings grounded on insufficiency of pleadings. *E.g.,* *Leatherman v. Tarrant County Narcotics*

*Intelligence and Coordination Unit,* 507 U.S. 163, 167–69, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) ("The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."); *In re Dill,* 731 F.2d 629, 631 (9th Cir.1984) ("Liberality of construction and 'notice pleading' apply to actions brought under the Bankruptcy Code."). Though not precisely in point, these precedents are close enough for this court to say that the Bankruptcy Court's reasoning on grounds of insufficiency of the original complaint was incompatible with the reasoning of higher courts about sufficiency of pleadings. For this reason, this matter should be remanded to the Bankruptcy Court to reconsider and state needed findings and conclusions to justify whatever result it reaches after reconsideration.

The disposition of count one of Cadle Company's Amended Complaint will be considered in Parts IV and V this opinion.

## II.

The second of the two Orders from which appeal was taken is the Bankruptcy Court Order of November 7, 1995. The Order allowed in part and denied in part the Debtor's Motion for Summary Judgment with respect to his counterclaim in the Adversary Proceeding filed by the Cadle Company against the Debtor. it declared judgment:

(a) in favor of the Debtor and against The Cadle Company on Count I of the counterclaim [for violation of 11 U.S.C. § 362(h) ] in the amount of $257.50, plus a sum to be determined upon the filing of the supplemental fee application by a law firm representing the Debtor pro bono in the special circumstances of the case; and

(b) in favor of Cadle and against the Debtor on Count II of the counterclaim [under Mass. Gen. Laws ch. 93A, § 2].

The last paragraph of the Order adds:

The Court orders Cadle and its attorney to pay counsel to the Debtor $1,500 as a

sanction for interposing a frivolous argument in defense of Count II of the Debtor's Counterclaim.

Two particular parts of the Order of November 7, 1995 were distinctively interlocutory in ways that make it doubtful that this court should allow leave for an appeal on these matters.

First, the ruling on Count I left to later determination a sum to be awarded to a law firm on a stated ground that was not within the scope of relief sought in that count of the counterclaim. Immediate appealability of this ruling was dubious because, at least until it had determined the sum, the Bankruptcy Court still had not concluded its actions on the motion for summary judgment. It still had authority to decide that it had exceeded its authority and should withdraw and reconsider this part of its Order of November 7, 1995.

Second, as far as the record before this court on appeal shows, the last paragraph of the Order (made on the initiative of the court rather than on motion of a party) did not dispose of any claim or counterclaim in the case; making such an addition to an order, even one that is otherwise appealable, does not automatically make the addition immediately appealable. Thus, this aspect of the Order may remain one that the Bankruptcy Court has authority to reconsider until a final judgment is ordered. Moreover, the Bankruptcy Court's assumption that the applicable law was so clearly settled that Cadle's claim (for the making of which a sanction was imposed) was "frivolous" is undercut by the fact that some aspects of the applicable law turned out later to be decided by the Supreme Court in a way contrary to the Bankruptcy Court's assumptions.

For other reasons explained below, however, I conclude that in any event the Orders of April 21 and November 7, 1995 must be vacated, and the matter must be remanded for reconsideration. The Bankruptcy Court's reconsideration may extend to all aspects of the Orders of April 21 and November 7, 1995, once they are vacated. Thus, any doubts about validity of the two special aspects of the Order of November 7 identified above, or about appealability, may be mooted by the Bankruptcy Court's new decision. I do not undertake to resolve those doubts on this appeal.

## III.

This court has jurisdiction over this appeal under 28 U.S.C. § 158(a).

Under the applicable standards of review this court considers issues of law *de novo* and reviews findings of fact deferentially.

The Appellee's assertion (Brief at 5) that "[a] district court, acting as an appellate court in a bankruptcy proceeding, reviews the bankruptcy court's *findings* of law *de novo*," is misleading, and if meant to suggest that even the factual findings within a mixed-law-fact determination are to be reviewed *de novo* is overstatement, at least, if not more seriously flawed. *See generally e.g., Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1132 (1st Cir.1995) ("For purposes of appellate review, mixed questions of fact and law ordinarily fall along a degree-of-deference continuum, ranging from plenary review for law-dominated questions to clear-error review for fact-dominated questions."); *Lipsett v. Blanco,* 975 F.2d 934, 943 (1st Cir.1992) (recognizing that ordinarily a mixed-law-fact determination of an award of attorney fees must be remanded when based on an error of law but holding that the appellate court could itself recalculate where the court could apply correct law to the facts of record before the appellate court and "calculate a fair and reasonable fee without resorting to remand").

■■ Also, Appellee asserts that "[t]he standard for reviewing a bankruptcy court's imposition of sanctions under Federal Rule of Bankruptcy Procedure 9011 is abuse of discretion." Again, the appellee has made an assertion that is at least misleading if not more deeply flawed. "Abuse of discretion" is not the standard applying to review of a ruling on an issue of law. Rather, a *de novo* standard applies to determining whether a *sua sponte* imposition of a sanction rested on *an error of law* in interpreting Rule 9011. Also, if the record does not disclose the reasoned basis for the sanction, this court may remand for a statement of reasons suffi-

cient to enable this court to review the decision under the applicable standard of review.

A party whose assertions in its brief before this court are as flawed as those identified above is in an unappealing posture when, in turn, asking this court to invoke a hypercritical, preclusionary rule against an opposing party. Yet, that is exactly the nature of Debtor's argument that the Bankruptcy Court's sanction against Cadle should be affirmed on appeal on the ground that what Cadle argued below with respect to the Debtor's Chapter 93A claim was not the argument made before this court (which Debtor thus impliedly concedes, at least arguendo, is not "frivolous"). Debtor asserts that Cadle argued below that it was not engaged in trade or commerce in Massachusetts. Brief at 16. Even if Debtor means to assert, however, that this was the *only* argument Cadle made below, orally or in writing, on this subject, Debtor fails to cite to any part of the record on appeal confirming Debtor's assertions about the limited nature of the argument below. Thus, this court has no basis for determining whether the Debtor's factual assertions about the argument below are, or are not, supported by the record. To be fair, the court should be equally strict or forgiving to counsel on both sides. In any event, Debtor's preclusionary contention will not be adopted on the present record, which lacks adequately supported findings and conclusions to sustain the sanction imposed. The most that Debtor can fairly be allowed is a remand for further proceedings.

## IV.

■ The distinctive circumstances of this appeal present other reasons, beyond those identified in Parts I–III above, for vacating the Orders of April 21 and November 7, 1995.

■ Precedents available to the Bankruptcy Court for its guidance, at the time it made its Orders of April 21 and November 7, 1995, were significantly undermined by a more recent decision of the Supreme Court of the United States. Because of the pendency of this appeal and lack of finality of the Orders of April 21 and November 7, 1995, the Supreme Court's later decision must be taken into account both by this court, and by the Bankruptcy Court on remand, in its final determination as to whether it should modify its Orders of April 21 and November 7, 1995. *See Biggins v. Hazen Paper Company,* 111 F.3d 205, —— (1st Cir.1997) ("new law" is applied in cases still on direct appeal).

In *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), decided in late November 1995, the Court stated:

The Bankruptcy Code's provisions for discharge stop short of certain debts resulting from "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In this case we consider the level of a creditor's reliance on a fraudulent misrepresentation necessary to place a debt thus beyond release. While the Court of Appeals [for the First Circuit] followed a rule requiring reasonable reliance on the statement, we hold the standard to be the less demanding one of justifiable reliance and accordingly vacate and remand.

*Id.* at ——, 116 S.Ct. at 439.

After reciting the history of separate paths of development of clauses (A) and (B) of this section of the Bankruptcy Code, the opinion of the Court, delivered by Justice Souter, declared:

The sum of all this history is two close statutory companions barring discharge. One applies expressly when the debt follows a transfer of value or extension of credit induced by falsity or fraud (not going to financial condition), the other when the debt follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied.

*Id.* at ——, 116 S.Ct. at 441.

In the appeal now before this court, the Bankruptcy Court's two memoranda explaining its Orders were grounded in material part on the Bankruptcy Court's interpretation of the meaning of 11 U.S.C. § 523(a)(2)(A) with respect to "duty" to search out and examine records and with respect to the reliance element under § 523(a)(2)(A)

The Order of November 7, 1995 was also grounded in part on the Bankruptcy Court's interpretation of the meaning of the phrase "any willful violation of a stay" in bankruptcy, 11 U.S.C. § 362(h).

■ An example of the Bankruptcy Court's reasoning that may be reconsidered is the following statement in the Memorandum of November 7, 1995:

These courts [a Bankruptcy Court in the District of New Hampshire and Courts of Appeals in the Second, Third, Fourth, and Ninth Circuits] hold that a willful violation [of 11 U.S.C. § 362(h)] occurs when a creditor 1) has knowledge of the petition; and 2) the *act which violates* the stay *was an intentional act. In re Putnam*, 167 B.R. 737, 740 (Bankr.D.N.H. 1994).

Applying this test to the admitted facts, the Court finds that Cadle willfully violated the automatic stay. Cadle knew of the bankruptcy filing and nevertheless *sent a letter to one of the Debtor's tenants demanding that rents owed to Mrs. McKernan be remitted to it.* The letter did not explicitly indicate that the rents, which were owed to both the Debtor and Mrs. McKernan on account of their joint ownership of the property as tenants by the entirety, were divisible or suggest that some of the rents, presumably half, should still be payable to the Debtor....

Memorandum of November 7, 1995 at 9 (emphasis added).

■ Sending a letter, "which violates the stay," may be intentional with respect to "sending" the letter but not intentional with respect to "violating the stay." "Intent," correctly understood, focuses on consequences and not simply on the "act" itself, however broadly or narrowly "act" may be defined. For this reason, the findings recited in this quoted passage from the Bankruptcy Court's Memorandum fall short of showing an adequate set of subsidiary findings about intended consequences to satisfy the definition of "willful," in § 523(a)(2)(A), as explained by the Supreme Court. Of course, the Supreme Court had before it a different kind of case from the one now on appeal here, but what it said has force here, by analogy. In speaking of the issue commonly referred to as the "duty" question, and referred to in the opinion of the Court as the issue about whether one "is required to make an investigation of his own," the Court stated:

As a comment to § 541 [of *Restatement of Torts (Second)*] explains, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. .... On the other hand, the rule stated in this section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id.,* § 541, Comment a.

A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

Similarly the edition of Prosser's *Law of Torts* available in 1978 (as well as its current successor) states that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." W. Prosser, *Law of Torts* § 108, p. 718 (4th ed. 1971); *accord,* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on The Law of Torts,* § 108 at 752 (5th ed. 1984) (Prosser and Keeton)). Prosser represents common-law authority as rejecting the reasonable person standard here, stating that "the matter seems to turn upon an individual standard of the plaintiff's own capacity and knowledge which he has, or which may fairly be charged against him from facts within his observation in the light of his individual case." *Prosser and Keeton, supra,* § 108 at 717; *accord Prosser and Keeton, supra,*

§ 108 at 751; *see also* 1 F. Harper & F. James, *Law of Torts* § 7.12 at 581–583 (1956) (rejecting reasonableness standard in misrepresentation cases in favor of justifiability and stating that "by the distinct tendency of modern cases, the plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiff's failure to make the investigation or examination to verify the same") (footnote omitted; accord, 2 F. Harper, F. James, & O. Gray, *Law of Torts* § 7.1, pp. 455–458 (2d ed.1986).

—— U.S. at ——–——, 116 S.Ct. at 444–45.

Also relevant to the Bankruptcy Court's apparent premise, in the present case, about the meaning of "intentional act" (*see* Memorandum of November 7, 1995 at 9) is another passage in one of the texts that the Supreme Court cited—that is, *Prosser and Keeton*—which states:

> One prerequisite of liability is that the defendant act (or fail to act when there is a legal duty to act). An involuntary muscular movement of a sleeping or otherwise incapacitated person will not support liability. But an "act," as that term is ordinarily used, is a voluntary contraction of the muscles, and nothing more. An act is to be distinguished from its consequences.
>
> > "Thus, if the actor, having pointed a pistol at another, pulls the trigger, the act is the pulling of the trigger and not the impingement of the bullet upon the other's person."
>
> When "act" is used in this sense, it is tautological to speak of a "voluntary act," [or, one might add, "intentional act" in a sense consistent with the Restatement definitions of "intent" and "act,"] and self-contradictory to speak of an "involuntary act," since every act is voluntary. Nevertheless, the phrases ["intentional act,"] "voluntary act" and "involuntary act" do appear in legal prose. Moreover, differences may be deeper than merely a choice of terminology; one who uses the phrase ["intentional act" or] "voluntary act" may be using "act" to mean something different from a mere voluntary contraction of the muscles; sometimes the phrase "voluntary act" is used to mean something closer to the concept of intent (as defined in the Restatement and in common usage), which focuses not upon the mere "act" (in the narrower sense, defined in the Restatement and in common usage) but upon volition in relation to consequences as well as volition in relation to the muscular contraction. The movement of the finger which fires a gun is the same, whether it takes place in a crowded city, or in the solitude of the Mojave Desert, and regardless of the actor's state of mind about the consequences. But the legal outcome will depend on the actor's surroundings and the actor's state of mind. The actor may move the muscles of the finger for the purpose of pulling the trigger, for the purpose of causing the bullet to strike another, for the purpose of killing the other, for the purpose of revenge, of defense of country, or of self-protection against attack.

*Prosser and Keeton,* § 8 at 34 (footnotes omitted, bracketed phrases inserted).

Another passage in *Prosser and Keeton* emphasizes an additional source of confusion about "intent" that is quite relevant in this case.

> Another source of great confusion is failure to distinguish between (1) the factual elements essential to a finding of intent and (2) the elements of proof and argument that advocates and factfinders may bring to bear in addressing the question whether those factual elements are present in a given case. The factfinder need not credit the actor's assertion that the actor did not intend the result in question. One of the common lines of argument against crediting the actor's assertion is (1) that, given the circumstances disclosed in the evidence, a reasonable person in the actor's position would have known that the consequence in question was substantially certain to follow the act, (2) that the evidence shows that the actor was even brighter and shrewder than most others, and (3) that the inference is therefore compelling that the actor knew even though

testifying otherwise. If the factfinder credits inference (1) but not inferences (2) and (3), the finding is negligence. But if the factfinder credits all three inferences, the finding is intent to produce the consequence in question. Expressed another way the point is this: Since intent is a state of mind, it is plainly incorrect for a court to instruct a jury that an actor is presumed to intend the natural and probable consequences of the actor's conduct; but it is correct to tell the jury that, relying on circumstantial evidence, they may infer that the actor's state of mind was the same as a reasonable person's state of mind would have been. Thus, when the driver who whips up horses with a loud yell while passing a neighbor's team denies intent to cause a runaway, the factfinder may discredit the driver's testimony; and the defendant on a bicycle who rides down a person in full view on a sidewalk where there is ample room to pass may learn that the factfinder (judge or jury) is unwilling to credit the statement, "I didn't mean to do it."

On the other hand, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. The line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the actor a substantial certainty.

*Prosser and Keeton,* § 8, at 35–36 (footnotes omitted).

## V.

Whether Cadle interposed a frivolous argument with regard to jurisdiction under Mass. Gen. Law § 93A depends, to some degree, on whether the acts that Cadle engaged in reached the threshold necessary to constitute an act that would give the courts jurisdiction over Cadle. Thus, answers to these interpretive questions, reached with the benefit of guidance either directly from or by analogy to *Field v. Mans,* may also affect the Bankruptcy's Court's evaluation of factors bearing upon whether "the actions and transactions" of Cadle were sufficient to give the Bankruptcy Court jurisdiction over Cadle.

In personam jurisdiction of the United States District Court for the District of Massachusetts, and of the Bankruptcy Court of this district, often depends in part on statutory and decisional law of Massachusetts. That law has developed several independent grounds of in personam jurisdiction over nonresidents. One key distinction, relevant for consideration in this appeal, is between "transactional" and "general" grounds for exercising jurisdiction over a corporation.

■ Transactional grounds of jurisdiction ordinarily require, as one element of establishing jurisdiction, a determination that a claim or cause of action asserted "arises from" some defined act, course of conduct, or consequence occurring in Massachusetts. Most of the authoritative definitions of the act, conduct, or consequence to be established are associated with one or another of the several independent subdivisions of the Massachusetts "long-arm statute," found at Mass. Gen. Laws ch. 223A. Citation to an element essential to a determination about applicability of one of the subdivisions may be out of place when argued as if it were an element for determining jurisdiction under a different subdivision of the long-arm statute. This remains so even if evidence about that matter may be admissible and subject to being weighed by a finder of fact in deciding whether a somewhat different element of another ground of jurisdiction has been established.

■ An example is that, under Chapter 223A, § 3(d), a substantial volume of revenue from transactions in Massachusetts is an essential element, but 3(d) requires, along with this showing, other elements that are not required under 3(a) or 3(b). *See e.g., American Home Assur. Co. v. Sport Maska, Inc.* 808 F.Supp. 67 (D.Mass.1992). Thus, an ar-

gument for a jurisdictional determination based on substantial revenue from transactions in Massachusetts lacks merit unless it is accompanied with a proffer of admissible evidence to support findings that each of the other elements of 3(d) is satisfied. This remains true even if evidence of a substantial volume of revenue may, in the circumstances of the particular case, be relevant to some element that must be satisfied under one of the other subdivisions of the long-arm statute.

Grounds of "transactional" jurisdiction extend beyond those specified in the Massachusetts long-arm statute. An example relevant to this appeal is a possibly debatable issue about whether Cadle's conduct was sufficient to constitute an "alleged unfair or deceptive act or practice" that occurred "primarily and substantially within the commonwealth," as that phrase is used in Mass. Gen. Laws ch. 93A, § 11. Here, too, however, the assertion of in personam jurisdiction must be supported by admissible evidence sufficient to support every element of one of the authoritatively recognized independent grounds. Thus, the most likely possibility is to use Chapter 93A to identify the elements of the cause of action asserted and then proffer admissible evidence sufficient to support findings that this cause of action "arises from" an act or conduct of Cadle in Massachusetts that satisfies one of the subdivisions of Chapter 223A, § 3.

Each of these methods of showing "transactional" jurisdiction differs substantially from showing "general" grounds for exercising jurisdiction over a corporation. Under Massachusetts law, the most commonly asserted "general" ground of in personam jurisdiction is that corporate acts and courses of conduct in Massachusetts are sufficient to constitute "doing business in the commonwealth," Mass. Gen. Laws ch. 181, § 3, thus subjecting a foreign entity to suit in Massachusetts courts. Mass. Gen. Laws ch. 181, § 15.

But, this is not the only basis for "general" jurisdiction that authorizes a court to proceed with a case in the absence of "transactional" grounds of in personam jurisdiction; Massachusetts law has developed more than one independent ground for "general" jurisdiction. Another example of "general" in personam jurisdiction is identified in a recent decision of the Supreme Judicial Court, *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 625 N.E.2d 549 (1994). In that opinion, the Supreme Judicial Court calls attention to the possibility of general jurisdiction on another ground, even though leaving to later consideration the precise requirements for its applicability since a transactional ground applied to the only claim before the court in that case. *Id.* 625 N.E.2d at 550 n. 3.

■ The requirements a claimant must satisfy to show some ground of "general" in personam jurisdiction over a corporation are more demanding, but if a claimant can meet them, then the claimant may proceed with all claims that can properly be joined in the action without any need for meeting transactional requirements.

■ If a claimant fails to show a ground of "general" in personam jurisdiction but does succeed in meeting the requirements of transactional jurisdiction for at least one claim, the court may then need to consider whether it is authorized and should take supplemental jurisdiction over one or more claims other than the claim as to which transactional jurisdiction is satisfied. *See generally United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The Bankruptcy Court, on remand, will be free to consider whether it should view interpretive questions about grounds of in personam jurisdiction in a different light after taking account of perspectives explained by the Supreme Court with respect to the meaning of "willful" as used in 11 U.S.C. § 523 and in analogous contexts.

■ Also, as it reconsiders whether any jurisdictional argument was "frivolous," the Bankruptcy Court may appropriately take into account that the distinction in Massachusetts law between "general" and "transactional" grounds of in personam jurisdiction is substantially different from the distinction between "general" and "specific" jurisdiction in federal law that is explained in *Donatelli*

*v. Nat'l Hockey League,* 893 F.2d 459, 462–65 (1st Cir.1990).

## VI.

The ruling of the Bankruptcy Court in the Memorandum of April 21, 1995, at pages 6–7, that "nothing in the original complaint would have put the Debtor on notice that Cadle contemplated an action for the alleged conversion of rents in which it [Cadle] claims a security interest" is a conclusion. Because it was not explained as an inference compelled by undisputed evidence before the court in the summary-judgment record, the order of dismissal grounded on this conclusion cannot be affirmed unless it is compelled by an applicable legal rule. No legal rule to that effect has been identified by the debtor, and this court is aware of none. If, on reconsideration, the Bankruptcy Court has before it undisputed evidence that compels this inference—evidence that could not be discounted or disbelieved by a finder of facts—it may come to the same conclusion "as a matter of law" because it determines (without itself making any finding of fact) that no finder of fact could reasonably make any other finding on the evidence of record. Only on such a determination could dismissal or summary judgment in favor of the Debtor again be ordered on count two of Cadle's Amended complaint.

## VII.

The ruling of the Bankruptcy Court in the Memorandum of November 7, 1995, that all that is required to show a willful violation of 11 U.S.C. § 362(h) is "knowledge of the petition" and that "the act which violates the stay is an intentional act" cannot be affirmed, and the order of summary judgment on which it is based cannot be affirmed.

■■■ One who intends a specified act (such as the muscular movements involved in "sending" a letter) will have committed a violation of the stay, under *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), only if when he committed that specified act he had the state of mind, explained in the opinion of the Court in *Field,* with respect to relevant *consequences* of the specified act.

The Order of November 7 is grounded on the erroneous assumption that all the Debtor needed to show was that Cadle knew the bankruptcy petition had been filed and intended to do the specified act that the Debtor claims to be a violation of the stay.

Of course, it does not follow from the inappropriateness of summary judgment for the Debtor (if that is what the Bankruptcy Court concludes to be correct, after reconsideration) that summary judgment must be allowed for Cadle. A third obvious possibility to be considered by the Bankruptcy Court on remand is that a genuine dispute of material fact exists and the matter must be submitted to a finder of fact. Cadle has failed to persuade this court that the present record shows that no genuine dispute of material fact stands in the way of Cadle's motion for summary judgment.

Thus, this matter must be remanded to the Bankruptcy Court for reconsideration. The Bankruptcy Court will not be limited to reconsidering *on the present record;* it may in its discretion allow further submissions before deciding the motions for summary judgment. *See Biggins v. Hazen Paper Company,* 111 F.3d 205, 209 n. 3 (1st Cir.1997), and cases cited(on remand, a court may consider issues not decided by the remanding court and may allow the parties to file additional submissions).

## CONCLUSION

For all the foregoing reasons, I conclude that the most appropriate disposition of this appeal is an Order vacating the Bankruptcy Court's Orders of April 21 and November 7, 1995, and a remand to the Bankruptcy Court, which will have the same freedom in considering the motions for summary judgment and all related matters as if this appeal had not been filed and the Bankruptcy Court had not yet made any ruling on the motions.

Accordingly, it is ORDERED:

The Clerk of this court is directed, forthwith, to enter on a separate document a Final Judgment as follows:

The Bankruptcy Court's Orders of April 21 and November 7, 1995, from which this

appeal was taken, are vacated. The matter is remanded to the Bankruptcy Court with full authority to consider the Motions for Summary Judgment and all related matters, as if this appeal had not occurred and no ruling on any of these matters had previously been made.